GITTONE, Mayor, et al. v. WARNER BROS. PICTURES, Inc., et al.

No. 364.

District Court, E. D. Pennsylvania.

Nov. 6, 1939.

Memorandum Sur Decree Nov. 8, 1939.

Harry Shapiro, of Philadelphia, Pa., for plaintiffs.

D. Benjamin Kresch, Morris Wolf, Esq., Benjamin M. Golder, and Schnader & Lewis, Wm. A. Schnader, all of Philadelphia, Pa., for defendants.

KIRKPATRICK, District Judge.

Findings of Fact

1. The Cumberland Holding Company and its wholly owned subsidiary Landis Theatre, both of whom are New Jersey corporations, and which are hereinafter referred to as "exhibitor plaintiffs," own and operate the Landis Theatre in Vineland, New Jersey. The Stock of the Cumberland Holding Company is held and owned by residents and citizens of the community of Vineland.

2. The defendants, Warner Bros. Circuit Management Corporation; Warner Bros. Theatres, Inc., a New Jersey corporation; and Warner Bros. Theatres, Inc., a Delaware corporation, all of whom are wholly owned subsidiaries of the defendant, Warner Bros. Pictures, Inc., and who are

hereinafter referred to as "exhibitor defendants," own and operate many theatres in Philadelphia and its vicinity, including the Grand and Globe Theatres in Vineland, New Jersey.

3. The defendants, Warner Bros. Pictures, Inc.; Vitagraph, Inc.; Paramount Pictures, Inc.; RKO Radio Pictures, Inc.; Loew's Inc., Twentieth Centure-Fox Film Corporation; Columbia Pictures Corporation; Universal Film Exchange, Inc.; and United Artists Corporation, hereinafter referred to as "distributor defendants," are engaged in the business of distributing motion pictures.

4. All defendants are engaged in interstate commerce in this district. The distributor defendants maintain branch film exchanges in Philadelphia which serve eastern Pennsylvania, Delaware and southern New Jersey, including Vineland.

5. The major motion picture companies, Warner, Paramount, RKO, Loew and Fox, are engaged in the production, distribution and exhibition of motion pictures; the major motion picture companies, Columbia and Universal, are engaged in the production and distribution of motion pictures; and the remaining major motion picture company, United Artists, is engaged in the distribution of motion pictures made by associated producers, some of whom are owners and holders of its capital stock.

6. Every branch of the motion picture industry involved in this action is either in, or directly affects, interstate commerce.

7. The distributor defendants and their affiliated interests control the production and distribution of approximately 350 feature motion pictures annually or more than 80% of the feature motion pictures available for exhibition in the United States. These include practically all motion pictures of the finer type having the greatest public appeal.

8. No exhibitor can successfully operate a theatre without reasonable access to the product of major producers.

9. At the beginning of 1935 and for several years prior thereto, Vineland had but two theatres, both of which were owned by the exhibitor defendants. They were: the Globe, which was closed, and which had been closed substantially ever since the exhibitor defendants acquired it in 1930; and the Grand, which was open, and which had been open since its acquisition by the defendants at the same time.

The Grand was being operated on a full week basis under a policy of changing features four times a week, and therefore exhibited annually some 200 feature pictures. Both these theatres were of antiquated construction, were uncomfortable, unsanitary, and were believed, with good reason, by many persons in the community to be unsafe.

10. In 1935 a number of citizens of Vineland conceived and promoted a plan for the erection of a theatre to be financed by the citizens of the community.

11. Shortly thereafter the persons interested in the new project began inquiring for suitable sites upon which a new theatre might be erected, and the project became generally known in the community.

12. In August 1935, the exhibitor defendants reopened the Globe, and during the 1935–36 season exhibited pictures in it on week-ends only.

13. In August 1936, the exhibitor plaintiffs commenced the erection of the Landis Theatre.

14. Shortly after August 1936, the exhibitor defendants began to renovate and redecorate the Grand. In December 1936, the exhibitor defendants discontinued such renovating and redecorating and began to completely rebuild the Grand. The rebuilt Grand was opened on March 11, 1937, and the Landis was opened March 12, 1937. Both these theatres are modern, fire-proof theatres, offering the usual modern comforts, facilities and conveniences.

15. In September 1936, the exhibitor defendants changed the week-end operating policy of the Globe to a full week basis. The Globe has never been rebuilt, although some renovating was done after notice by the then mayor of Vineland. It was originally constructed in the nickelodeon days by taking out a partition wall between two old stores. It still is an antiquated building, lacking many conveniences and luxuries to which the public is accustomed in modern theatres. It has the appearance of a cheap, second-rate theatre, and, because of its condition, has comparatively little earning power. It has approximately half the seating capacity of the Landis and a little more than half that of the Grand.

16. Since September 1936 the Globe has been operated on a seven-day week for the principal purpose of consuming and delaying product required by Landis.

17. Prior to the building of the Landis Theatre, the exhibitor defendants had obtained from the distributor defendants (including Vitagraph, the Warner Brothers affiliate) licenses for first run selective exhibition at the Grand of practically all pictures distributed by the distributor defendants. The number of pictures covered by the license agreements in effect for the 1936–37 season, excluding those distributed by Vitagraph, total 317, of which Warner was obliged to exhibit 164, although it had the right to exhibit all.

18. In the later part of 1936; after the construction of the Landis Theatre was begun and before its opening, the license status of the exhibitor defendants was changed. The number of pictures which Warner was obliged to take was increased by 91 pictures and it was provided that the pictures could be exhibited first run at either the Grand or the Globe.

NOTE: The license agreements are somewhat complicated, and the above figures (contended for by the plaintiff) may not be precisely accurate. The defendant contends that the original licenses were for 303 pictures, of which Warner was obliged to exhibit 176, and that the new or modified licenses covered 358 pictures with a minimum commitment of 231, or an increase of pictures which Warner was obliged to take of 57. I have found according to the plaintiff's request, but I do not think the difference is of great importance. The Globe may have been included in the Warner licenses prior to September 1936, when it began to operate on a full week basis, but as a matter of actual practice it was at that time that it began to be operated as a full time, first run theatre.

19. All the distributors except Universal admittedly have refused and will continue to refuse first run licenses similar to those now in effect with the Warner Theatres, to the Landis Theatre, without regard to the price which the Landis may be willing to pay for such first run licenses, provided the distributors can make what their witnesses describe as "satisfactory deals" with the Warner Theatres, Grand and Globe. Up to the present time they'have always been able to make "satisfactory deals" with the Warner Theatres.

20. In the season 1937–38, Universal licensed all of its pictures, including all of its serials, to Landis; in 1938–39 Warner requested the serials, and thereupon Universal licensed the serials to Warner. All of Universal's other products for the year 1938-39 was licensed to Landis.

21. The established policy long followed in cities and localities other than Vineland by the distributor defendants in granting and protecting first run licenses and in selecting their first run licensees is as follows:

(a) Zoning, classification of theatres into first, second and subsequent run licensees, and the imposing of a clearance period for second and subsequent runs, are practices universally followed. Since the larger proportion of the revenue of the industry is derived from first run exhibition, it is believed to be necessary, in order to protect such first run exhibition, to have a clearance period within which the first run pictures may not be shown again by a competing theatre. The clearance period varies in different sections. In and around Vineland it has generally been 28 days.

(b) First run contracts are usually first offered to one exhibitor and are not offered to another theatre until and unless the first run exhibitor and the distributor are unable to negotiate a contract. In that sense, they are not sold upon an open, competitive basis.

(c) In selecting first run licensees in each locality, the distributors' policy is to select those theatres which have the greatest ability to pay the highest license fees and give the best presentations, thereby producing the greatest revenue for the picture and enhancing its value in the surrounding territory. In this connection, all things are taken into consideration which affect the ability of the theatre to earn large box-office receipts, such as quality, equipment, size, location and management. It is the general practice in granting first run licenses to regard the theatre itself, rather than the owner, as the customer. It is generally desired not to sell away from prior first run exhibitors who have been dealing with the distributors on a satisfactory basis, but this is subordinated to the general policy of selling first runs to the better theatres as defined in the preceding statements. For example, if an old owner takes a mediocre theatre or one not fitting to show the distributor's merchandize in, and a new owner who is a competent operator should take over the old theatre, the distributors would as a matter

of practice continue to give the first run license to the better theatre, regardless of its change of ownership.

22. The Landis and the rebuilt Grand are modern theatres. The Landis has a somewhat greater seating capacity than the Grand, is locally owned and has community affiliations—matters having a bearing upon its potential earning power. It is managed by a former successful manager of a Warner theatre, Herbert Lubin, engaged in January 1937. The Grand is an old, established, satisfactory customer. The Globe is a second-class theatre, and much less desirable from the standpoint of earning power and of the standards usually set by the distributors and mentioned in the preceding finding. It is in all respects greatly inferior to the Grand and the Landis.

23. The application of the distributors' policy of selecting first run exhibitors as stated by them in effect generally should normally result in the following method of selection in Vineland; The Landis and Grand would divide first run product; the Globe would exhibit second run product.

24. Anticipating the opening of the Landis Theatre, the distributors, except Universal, made a radical departure from their previously practiced policy, and, in consequence thereof, after the Landis was erected, declined to license any first run product to Landis, but licensed the owner, Warner, for the exhibition of first run products at the Globe as well as the Grand, to the exclusion of the Landis. This licensing policy is still in effect.

25. Warner, because of its position in the first run motion picture market in the Philadelphia area, has a potential, coercive, power over the distributors. In Philadelphia Warner operates all five metropolitan first run theatres, and 14 of the 16 first run neighborhood theatres.

26. In announcing the proposed rebuilding of the Grand, Warner, in a newspaper article, announced that it had contracts for first run exhibitions from all the distributors for both the Grand and the Globe.

27. Warner has held exclusive first run licenses for exhibition at the Grand and Globe from all distributors except Universal for the seasons 1937–38 and 1938–39, and, according to the statements of the distributors, such licenses will continue to be offered hereafter to Warner to the exclusion of the Landis.

28. Each distributor knew that every other distributor at first, and later every distributor except Universal, licensed its product to Warner for first run exhibition at the Grand and Globe, to the exclusion of the Landis.

29. Each distributor knew that the granting of such first run licenses by all or substantially all distributors would necessarily result in the creation and perpetuation of a monopoly by Warner of first run exhibition in Vineland.

30. The granting of such first run licenses by substantially all distributors to Warner has resulted in the creation of a monopoly by Warner of first run exhibition in Vineland and the unreasonable restraint of interstate trade and commerce.

31. Vineland is a community which can profitably support two first run theatres. The restraint of trade imposed by the distributors' refusal to permit Landis to acquire a fair portion of first runs on a nondiscriminatory basis is not reasonably necessary for the protection of the business of Warner in connection with first run films licensed to them by the distributors.

32. Motion pictures are copyrighted, and the contract between the distributor and the exhibitor consists of a license under copyright.

33. The agreements between Warner and each distributor consist of a "master contract" which incorporates the printed license agreements of the particular distributor (modified to the extent indicated by the typewritten portions of the master agreement) to which are attached appendices known as "deal sheets" and "clearance sheets." The agreements are generally similar. The agreements between Warner and the distributors, to a greater or lesser degree, grant Warner privileges and preferences not granted to independent theatres such as the Landis.

34. The agreements between distributors and independent exhibitors are in the form of "license agreements." The license agreements granted to Landis do not contain the privileges and preferences with regard to first run exhibition granted to Warner by the distributors.

35. In general, the distributors have refused to license pictures to the exhibitor plaintiffs until after they have been either utilized or rejected by Warner.

NOTE: The defendants wish me to conclude the following the above finding, which I do: "Each distributor, including Vitagraph, has at all times been and is still ready and willing to license to the Landis Theatre the exhibition of its pictures subject to its obligations under the license agreements with Warner." I add, however, that this readiness and willingness does not permit Landis to obtain business of sufficient quality and quantity to enable it to survive as a first run theatre, or, in all reasonable probability, to survive as an independent theatre at all.

36. Generally, the Landis exhibits pictures distributed by the distributed defendants only at the sufferance and with the consent of Warner.

37. For the purpose of withholding product from the Landis, Warner has been permitted by the distributors to, and frequently does, overbuy and dissipate product.

38. The Globe, which is an old, antiquated theatre, has been kept open and operated on a full week basis for the sole purpose of consuming and delaying product which might otherwise be exhibited by the Landis, and thereby preventing profitable exhibition of such product by the Landis.

39. The result of the exclusion of the Landis from participation of first run product has been to enable the Grand and Globe to exhibit profitable, attractive pictures and to compel the Landis to exhibit unprofitable and unattractive pictures.

40. The Landis, like the Grand, originally charged admission prices of thirty (30¢) cents and twenty-five (25¢) cents and showed single features. In order to survive, the Landis has been compelled to lower its prices to twenty-five (25¢) cents and fifteen (15¢) cents; to exhibit double features; to offer premiums for attendance; and to exhibit pictures of a lower grade than would be exhibited were the exhibitor plaintiffs able to purchase product in a free and open market.

41. The exhibitor plaintiffs have been deprived of access to a free and open market in which they may purchase product, based on their ability and willingness to pay fair and reasonable film rents and, on the contrary, have been relegated to an inferior and secondary position where they may obtain product only under discriminatory terms, including rental, availability and protection.

42. The exhibitor plaintiffs have suffered, and, unless given injunctive relief, will continue to suffer irreparable loss. If the existing course of conduct on the part of the defendants continues much longer, the Landis Theatre will in all probability be forced into the hands of its creditors; or if it survives at all, it will be as a more or less unprofitable second-class theatre, its pictures for the most part being second run pictures and undesirable first runs rejected by its competitors, together with whatever shorts, comedies, westerns, newsreels, etc., that it will be allowed to pick up.

## Conclusions of Law

The Court has jurisdiction of the subject matter hereof and of all persons and parties hereto, and the complaint states a cause of action by the exhibitor plaintiffs against all defendants under the Act of Congress of July 2, 1890, commonly known as the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and under the Act of Congress of October 15, 1914, as amended and supplemented, commonly known as the Clayton Act, 38 Stat. 730.

The conspiracy to restrain and monopolize interstate trade and commerce in motion picture films, alleged in the complaint and more fully set forth in the foregoing findings of fact, is in violation of the Sherman Anti-Trust Act and the Clayton Act.

The license agreements between the distributor defendants and the exhibitor defendants with respect to the exhibition of motion pictures by the Grand and Globe Theatres in Vineland, New Jersey, are implements whereby such illegal monopoly and restraint on interstate commerce are perpetuated and protected, and therefore violate the Sherman Anti-Trust Act and the Clayton Act.

## Decree Nisi

This cause having come on to be heard at this term, and the defendants appearing by their attorneys, testimony having been taken, it is preliminarily and until further order of this Court ordered, adjudged and decreed as follows:

1. The conspiracy to restrain and to monopolize interstate trade and commerce in motion picture films alleged in the complaint herein and specifically set forth in findings of fact filed herewith, is hereby

828

declared illegal and in violation of the Act of Congress of July 2, 1890, commonly known as the Sherman Anti-Trust Act, as amended and supplemented by the Act of Congress of October 15, 1914, commonly known as the Clayton Act.

2. The defendants herein, and each of them, and each and all of their respective parent, associated and subsidiary corporations, and each and all of their respective officers and directors, and each and all of their respective agents, servants and employees, and all persons acting or claiming to act on their behalf, or any of them, be and they are hereby enjoined and restrained from:

(a) monopolizing or attempting to. monopolize the exhibition of motion pictures in Vineland, New Jersey, and its vicinity, or from entering into, engaging in, accomplishing or consummating, directly or indirectly, expressly or impliedly, any monopoly similar to that set forth in the findings of fact and declared illegal in the conclusions of law recited hereinabove;

(b) restraining or agreeing or conspiring to restrain interstate trade and commerce in said exhibition of motion pictures or from entering into, engaging in, accomplishing or consummating, directly or indirectly, expressly or impliedly, any restraint of interstate trade and commerce similar to that set forth in the findings of fact and declared illegal in the conclusions of law recited hereinabove;

(c) conspiring to protect or perpetuate any such monopoly or such restraint of or agreement or conspiracy to restrain said interstate trade and commerce or from entering into, engaging in, accomplishing or consummating, directly or indirectly, expressly or impliedly, any conspiracies similar to that set forth in the findings of fact and declared illegal in the conclusions of law recited hereinabove;

(d) enforcing, continuing, performing or acting under any provisions in the license agreements between the distributor defendants and the exhibitor defendants, granting to the exhibitor defendants the right to exhibit on first run exhibition in the Grand and Globe Theatres in Vineland, New Jersey, to the exclusion of the exhibitor plaintiffs, the motion pictures recited in said license agreements, or from entering into, executing or performing, directly or indirectly, expressly or impliedly, any similar provisions in any other license

agreements, franchises or arrangements whatsoever;

(e) entering into or performing any contracts, agreements, franchises or licenses for the exhibition of motion pictures in Vineland, New Jersey, and its vicinity, the individual or collective effect of which will restrain interstate commerce in, or create, protect or perpetuate a monopoly in or of, the exhibition of motion pictures, or any part of such exhibition, in the said territory;

(f) discriminating with respect to the licensing of motion picture film and all terms and conditions thereof, including prices, availability and protection, as between and among any and all motion picture exhibitors in Vineland, New Jersey, and its vicinity;

(g) licensing first run product to the exhibitor defendants to the exclusion of the exhibitor plaintiffs, with respect to the exhibition of motion pictures in Vineland, New Jersey, and its vicinity;

(h) licensing to the exhibitor defendants for exhibition in Vineland, New Jersey, and its vicinity more first run motion pictures than are reasonably necessary for the proper conduct of their business;

(i) granting to the exhibitor defendants the exclusive choice of motion pictures distributed by distributor defendants for exhibition in Vineland, New Jersey, and its vicinity before the same have been offered to the exhibitor plaintiffs;

(j) giving or attempting to give the exhibitor defendants the right to select or contract for motion picture films to be exhibited at the theatres operated by them in Vineland, New Jersey, and its vicinity before negotiations are entered into for film contracts with the exhibitor plaintiffs;

(k) licensing motion pictures to the exhibitor plaintiffs under terms and conditions more discriminatory, harsh and burdensome than are imposed on the exhibitor defendants;

(l) excluding exhibitor plaintiffs from contracting for the exhibition of first run product; or

(m) dissipating, or permitting or allowing the dissipation of, motion picture product, directly or indirectly, in any manner whatsoever.

3. Nothing in this decree contained shall be construed as prohibiting any lawful conduct by any one or more defendants

in the distribution and/or exhibition of motion pictures, anything in this decree to the contrary notwithstanding.

4. Plaintiffs shall enter bond with surety to be approved by the clerk of the Court in the sum of $10,000.

### Memorandum sur Decree

In the dissenting opinion in Interstate Circuit, Inc., et al. v. United States et al., 306 U.S. 208, 59 S.Ct. 467, 480, 83 L.Ed. 610, Mr. Justice Roberts said, "We have often held that a contract containing a covenant in restraint of trade is valid if the restraint is reasonably necessary for the protection of the right granted by the owner of the property," referring to property rights in copyrighted films. Whether or not the restraints imposed by the defendants, by means of which Warner has obtained a monopoly in Vineland, are reasonably necessary for the protection of its business and the rights granted by the distributors in the license agreements, is the question which lies at the heart of the present case. The defendants' principal arguments all come down to the proposition that they are reasonably necessary to that end, and, of course, if I thought that they were, I should not enter this decree. But it seems perfectly plain that there is room for two first class theatres in Vineland. A fair division of first run feature pictures will naturally affect Warner's earnings, because it will take away its virtual monopoly and place it upon a competitive basis, but there is nothing in this record to indicate that it is necessary for the protection of Warner's license rights and its business under them that the present monopoly should be continued, to the destruction of the competitor's business and against what is clearly the public interest.

The fact that Landis is a newcomer in the field does not affect the objective test. The motive professed by the defendants to favor an old customer as against a new one is merely a statement of a business policy which may be sound enough but which cannot be carried beyond the limit set by the law. If it were a defense, there would be very few decrees entered under the Anti-Trust Laws.

There are undoubtedly some kinds of business in which license agreements to constitute monopolies and operate to exclude newcomers entirely from a particular field, and yet may be entirely reasonable restraints. Justice Roberts was of the opinion that "the principles governing the right to use, sell, or turn to account other forms of property are equally applicable here." It is at just this point that I think the majority opinion differs from the dissent. The motion picture business is sui generis. Not only are there peculiar and complicated relationships between producers, distributors and exhibitors which arise of necessity from the nature of the thing sold, but it must be recognized that the public has a very definite interest in the services of recreation, education and information which the industry furnishes. I believe that the courts have already reached the point of view that a situation such as is presented by the facts of this case cannot be dealt with as though it were a matter of licensing retailers to sell a patented article, or of the restriction of the field of selling agents by manufacturers of automobiles. This public interest furnishes one reason why the policy announced by a distributors' witness (but not followed in Vineland) of dealing with the theatre rather than the owner should have the full approval of the Courts, and the fact that it registers in increased box office receipts means that the industry can follow it without sacrificing its own interests for the benefit of the public.

The remarks made by the Court at the hearing, upon which the defendants have based some argument, were made merely in an attempt to explore the questions involved. The Court was and still is fully aware of the difficulties in establishing a condition of fair competition in Vineland. That, however, is a matter which must be left to the defendants with all their knowledge of the methods and practices of the business. I suppose it would not be disputed that free competitive conditions exist elsewhere, and there is no insuperable reason why they may not exist in Vineland.

It is not the purpose of this decree to strike down the clearance provisions of the license agreements. Justice Roberts thought that the effect of the decision in the Interstate Circuit case was to do that. Whether or not that is a necessary conclusion is a question not here involved.