**WESTWAY THEATRE, Inc., v. TWEN-TIETH CENTURY-FOX FILM CORPORATION et al.**

No. 276.

District Court, D. Maryland.

Jan. 3, 1940.

Edgar Allan Poe, Sr., Edgar Allan Poe, Jr., and Bartlett, Poe & Claggett, all of Baltimore, Md., for plaintiff.

James Piper, R. Dorsey Watkins, J. Martin McDonough, and Piper, Watkins & Avirett, all of Baltimore, Md., and John Fletcher Caskey and Edward C. Raftery, both of New York City, for the distributor defendants.

Charles G. Page and J. Calvin Carney, both of Baltimore, Md., for Lyndhurst Corporation and individual defendants.

CHESNUT, District Judge.

This case arises out of the general business practice in the motion picture industry known as "clearance and run". In licensing the exhibition of motion pictures the owners of the copyrighted film customarily state a particular time for which the exhibition of the film is permitted, and the written license agreement generally provides in effect that during that time, and for a certain limited period thereafter, the exhibition of the film will not be licensed to other exhibitors in a prescribed competitive area. The time when the particular licensed exhibitor is permitted to show the picture is called the "run" and the interval of time thereafter during which the owner of the film agrees that other exhibitors shall not be permitted to exhibit the film is called the "clearance".

The very rapid and extensive development of the motion picture industry in the last thirty years has given rise to many questions as to the application of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, to various phases and practices of the industry. A general survey of the judicial decisions can be found in a note in Columbia Law Review, Vol. 36 (1936), pages 635 to 652, and Fordham Law Review, Vol. 7 (1938), pages 189 to 202. The general outline of the course of business of the industry is clearly and succinctly stated by Mr. Justice McReynolds in Paramount Famous Lasky Corp. v. United States, 282 U.S. 30, 36, 51 S.Ct. 42, 75 L.Ed. 145. About 700 pictures are produced annually in the United States, the majority by a comparatively few corporations. After the pictures are produced (most of them in California) they are then distributed for exhibition under license agreements to about 16,000 motion picture theatres throughout the country. The majority of the better pictures, called feature films, are distributed by eight separate corporations, seven of which are named as parties defendant in this case. The eighth is a corporation known as R-K-O.

In the instant case the plaintiff corporation is the lessee of a newly constructed motion picture theatre (called the Westway) at Ten Hills, a suburb of Baltimore City. Its complaint against the seven distributor defendants and certain important motion picture exhibitors in Baltimore City (who own and control the Edgewood Theatre, a competitor of the plaintiff) is that the seven distributors acting in combination and conspiracy in restraint of trade have refused to license the plaintiff to exhibit their motion pictures except after a so-called two weeks "clearance" in favor of the rival exhibitor defendants' competing theatre. The legal theory of the complaint is that the defendants have thus conspired and combined to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, 15 U.S.C.A. § 1; and the plaintiff, alleging special injury to it, seeks an injunction under section 26 of Title 15, U.S. C.A., to abate the alleged unlawful practice. More specifically it is contended that the license contracts between five of the seven distributors with the Lyndhurst Corporation (the corporate owner of the competing theatre) which give the latter a fourteen day clearance over the plaintiff, constitute unlawful contracts in restraint of trade.

A somewhat more detailed description of the competitive situation between the plaintiff and the defendant exhibitor will be helpful in understanding the particular problem. The Edgewood Theatre, owned and operated by the Lyndhurst Corporation, one of the defendants, which in turn is owned and controlled by the defendant Frank M. Durkee and his business associates, is situated on Edmondson Avenue in Baltimore City, a few miles from the heart of Baltimore and about two miles east from the western boundary of the City. Edmondson Avenue runs westerly from approximately the geographical center of Baltimore to its western limits. Proceeding westerly along Edmondson Avenue one comes within about three miles from the center of the City to the Bridge Theatre with the Astor Theatre about a mile further on and then the Edgewood Theatre half a mile further. Still proceeding westerly the area is closely built up with residential property for several blocks, succeeded by undeveloped land for a mile or more until the purely suburban area

of Ten Hills is reached, two miles from the Edgewood Theatre. Still proceeding westerly for two miles the town of Catonsville is reached where there is the Alpha Theatre. About three miles easterly of the Alpha Theatre and possibly a mile or so southeast from the Westway Theatre at Ten Hills there is the Irvington Theatre, and a mile or so from this is the Hollywood Theatre. Edmondson Avenue is a main arterial highway from Baltimore City to the western suburbs with a car line running to or near Catonsville. Frederick Road is a parallel arterial highway from the City also with a car line to Catonsville and beyond it for about four miles to Ellicott City where there is another motion picture theatre. Within a radius of about two miles from the plaintiff's Westway Theatre at Ten Hills there are thus four or five motion picture theatres. The Edgewood Theatre was built and equipped about ten years ago at a cost of approximately $150,000. It has seating capacity for 1,100 and is a modern well equipped motion picture house. There is a considerable suburban residential area with a substantial population at and near Ten Hills. In October 1938 Mr. Homand, the principal witness for the plaintiff and the present manager of the Westway Theatre, who had long been identified with the motion picture business in Baltimore City, determined that Ten Hills was a proper location for a new theatre, and having made the necessary financial arrangements with the owner of the land and a Baltimore capitalist had the theatre built and equipped at a cost of $85,000. It has a seating capacity for about 700 persons and is a motion picture theatre with all modern equipment.

Mr. Durkee and his business associates own or control and operate in all twenty-three motion picture theatres in Baltimore City, from the operations of which in the aggregate approximately $500,000 a year is paid for film rentals. The total number of motion picture theatres, large and small, in Baltimore City is upwards of one hundred and it is estimated that the gross amount of film rentals paid to the copyright owners therefrom is approximately $3,000,000 to $4,000,000 a year.

In the latter part of October 1938 a trade journal published a notice of the contemplated erection of the new theatre at Ten Hills. Promptly thereupon, under date of October 27, 1938, Mr. Durkee, on behalf of the Edgewood Theatre, wrote separately to each of the five distributors with which that theatre had motion picture contracts, calling attention to the project for the new theatre at Ten Hills, and claiming under his contract a clearance of fourteen days in favor of the Edgewood Theatre over the new theatre. Three of the five distributors promptly replied that they recognized the request or demand as reasonable and would grant it; the remaining two shortly afterwards did grant it. About the same time Mr. Homand wrote to all eight distributors notifying them of the projected theatre and expressing a desire to make contracts for the licensing of motion picture films. In consequence thereof the representatives of most of them visited Mr. Homand and expressed a willingness to negotiate with him upon the subject when the theatre was ready for operation. The Westway Theatre was completed in April 1939 and the general result of Mr. Homand's negotiations with the representatives of the several distributors was that only one, the R-K-O, was willing to sell him films for exhibition on terms other than clearance of fourteen days in favor of the Edgewood or other theatres. Five of the companies took this position because they considered the clearance reasonable in favor of the Edgewood Theatre. The other two distributors had a somewhat similar contract with the Alpha Theatre at Catonsville, and one distributor also put its position on the lack of available prints. The R-K-O distributor, however, having no outstanding contract with a theatre in the vicinity regarded as competitive, was willing to license films without the so-called fourteen days clearance. Homand then made contracts with the R-K-O and notified the seven other distributors that he regarded their position as unreasonable and would take the matter up with the Department of Justice. Thereafter this suit was filed on July 12, 1939 against all of the eight distributors except R-K-O, and against the Lyndhurst Corporation, the owner of the Edgewood Theatre; and against Durkee and his associates.

The case presents two issues. First, whether there has been conspiracy in restraint of trade between the defendants to deprive the plaintiff of motion picture films except on unreasonable terms; and second, whether the provisions of the separate contracts between five of the distributors and the Edgewood Theatre providing for the alleged unreasonable

clearance are invalid as in restraint of interstate trade. The feature of interstate commerce is involved because the picture films are distributed from the branch office of each of the distributors in the District of Columbia. Binderup v. Pathé Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308. The several contracts with the Edgewood Theatre, which were in force when the complaint was filed, known as the 1938-1939 contracts, have since expired, but they have been renewed by the parties on substantially similar terms for the current year. One object of the suit is to enjoin performance of the contracts in respect of the challenged clearance provisions.

In accordance with rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, I have made separate formal findings of fact which include the finding that the plaintiff has failed to show a conspiracy in restraint of trade between the defendants. It is unnecessary to discuss the evidence in detail, and is sufficient to say that the plaintiff's case in this respect is based purely on rather meagre circumstantial evidence which is entirely overcome by positive affirmative evidence to the contrary submitted by the defendants. The evidence of the alleged conspiracy consisted principally of the inference sought to be drawn from the fact that the five distributors with whom the Edgewood Theatre had contracts promptly, although separately, agreed to Durkee's request for clearance, supplemented to some extent by the testimony of Homand and his assistant Elliott, as to conversations with representatives of the distributors from which they inferred the latter were acting in concert in the matter. On the other hand each of the seven distributor defendants has submitted the positive testimony of its representatives who touched the matter of the contracts with the Edgewood Theatre in categorical denial of any joint action on their part, and in denial of the substance of the conversations mentioned. Each of the seven distributor defendants has a general office in New York or Philadelphia for the management of its business in the East; and each has a district representative at Washington, D. C., for the distribution of films in the contiguous territory (generally Maryland, Delaware, Virginia and West Virginia); and each has a sales representative for Baltimore. Practically all of the general eastern managers of the distributors (who alone have the authority to finally close contracts with distributors) and their respective Washington representatives and Baltimore salesmen have testified that there was no concert of action between them, and those with whom the conversations referred to were had, have substantially denied their alleged import. On this issue of alleged conspiracy the great preponderance of the testimony is in favor of the defendants; and the nature and circumstances are such as tend in all reasonable probability to support the defendants' contention and contradict that of the plaintiff. It is true that the five distributors who had contracts with the Edgewood Theatre all acted to the same general effect with regard to the contracts; but this was due to the fact that the contractual relations of the several parties were in a general way similar, and other conditions were likewise the same affecting all of them. It is therefore not at all surprising that they separately acted in the same way. There is an entire absence of direct evidence to show that their action was concerted, but on the contrary full and convincing evidence that each acted independently on its own judgment. Nor was there anything unusual, in accordance with the prevailing conditions in the motion picture industry, that the owners of the Edgewood Theatre requested or demanded clearance over the Westway Theatre. A similar demand was made about the same time by the owners of the Alpha Theatre at Catonsville on the distributors with which it had a contract; and likewise similar demand was also made by the owner of the Astor Theatre. It seems to be a common occurrence in the business that older and established theatres in the vicinity of a new theatre demand or at least seek a clearance over the new theatre. Uniform action is not necessarily concert of action. A like conclusion as to the absence of proof of conspiracy was reached by Judge Otis in the western district of Missouri in the somewhat similar case of Rolsky v. Fox Mid West Theatres. [1]

It is argued for the plaintiff that even if there was no conspiracy or agreement between the distributors in refusing the plaintiff's request for pictures in April 1939, nevertheless, after the filing of the complaint in this case in July 1939, the

---

[1] No opinion for publication.

making of the 1939–1940 contracts with the Edgewood Theatre in which the latter was given fourteen days clearance over the plaintiff, constituted such concerted action as amounted to substantial conspiracy. This contention is, I think, not sound. The contracts were in substance mere renewals of prior contracts which had been in force from time to time between the parties for several years, and there is nothing in the case to show that the distributors acted jointly or otherwise than on their respective individual judgments.

The more important question in the case is whether the individual and separate contracts providing for the clearance are themselves invalid, irrespective of conspiracy. The affirmative is strongly urged by the plaintiff on the authority of the recent decision of the Supreme Court in Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; but before considering the application of that case to this it will be helpful to briefly state some well settled principles of law with respect to what constitutes restraint of trade or commerce within the meaning of the Anti-Trust Act. Of course the contracts providing for clearance in favor of the Edgewood Theatre do restrain competition to some extent, but it has long been well settled that only *unreasonable* restraints of trade are condemned by the Sherman Act. Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (where the Supreme Court applied the "rule of reason"). At common law a covenant by the seller of property not to compete with the buyer in such a way as to derogate from the value of the property sold, was not invalid provided the restriction was reasonably necessary to the enjoyment by the buyer of the property bought. In United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122, affirmed, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, Circuit Judge Taft said, 85 F. at page 282 (quoting from Horner v. Graves, 7 Bing. 735):

"We do not see how a better test can be applied to the question whether this is or not a reasonable restraint of trade than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party requires can be of no benefit to either. It can only be oppressive. It is, in the eye of the law, unreasonable. Whatever is injurious to the interests of the public is void on the ground of public policy."

In determining whether a contract imposes an unreasonable restraint of trade, important considerations are the intent of the parties and the effect on the public. These tests can generally not be applied academically or theoretically but properly only upon a realistic consideration of the nature and conditions of the business. Appalachian Coals v. United States, 288 U.S. 344, 359, 53 S.Ct. 471, 77 L.Ed. 825; Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683.

First and subsequent runs of motion pictures is a practical physical necessity of the business. There are said to be about 16,000 motion picture theatres in the United States, and each of the large distributors serves several thousand. When a motion picture is photographed, called the negative, it is necessary to make numerous "positive" reproductions thereof, called prints. These are expensive, costing $200 to $300 each. In common practice only several hundred prints are made of any one picture. It is therefore obvious that there must be a rotation in their exhibition by different theatres. In practice the prints are distributed to the several districts of the United States for local distribution and exhibition. Commonly only four to ten prints are made for the district served by the Washington office. Generally one of these is distributed to each of the larger cities within the States served from the Washington branch office for what is called the first-run of the pictures, which is the greatest revenue producer for the distributor, as it is said that about 50% of the total revenue from the exhibition of any one picture comes from the first run. It is also a common feature of the license for the exhibition of the first run to provide clearance of twenty-one days over subsequent runs in the same city. After this period has expired subsequent runs of the picture are licensed to other theatres in the same city, usually called "neighborhood" theatres; and there are later exhibitions of the picture at still other theatres; there usually being a clearance period of variable amount between the

first and subsequent runs at neighborhood theatres in the same competitive territory. It is only by this procedure of first and subsequent runs that the limited number of prints can be utilized in the numerous theatres within a district.

The business purpose of each distributor is to obtain as much revenue as possible from the exhibition of each picture. To accomplish this the licenses generally provide for a percentage of the gross receipts of the theatre to be paid to the licensor, although to avoid the expense of checking the accuracy of the returns, sometimes a flat rental is charged on the basis of the estimate of what a certain percentage of the gross receipts would be. Naturally enough so-called feature films are more productive of revenue from early runs because the novelty of a known good picture is an element of its drawing power or popularity with the public. Subsequent runs therefore produce smaller revenue; and it is a natural result of the practice that theatres charging small admission fees of ten or fifteen cents are thus able to exhibit even good pictures on subsequent runs.

■ The nature of the copyright ownership must also be considered. The legal effect of a copyright, much like a patent, is to create in the owner an exclusive property right, with the incidental power to lease or license the use thereof by others on stipulated terms. The license may be exclusive or non-exclusive and accordingly when made exclusive may be made so for a limited time only. If the license is made exclusive, for a long or short period, it is obvious that the licensor may not properly allow others to exhibit the film during the period of the exclusive license. This in effect is what is accomplished by the provision in the license for clearance. Therefore such a provision in the contract is entirely consistent with the ordinary rights of ownership of property, and would seem to be entirely legal unless by combination or conspiracy or by harsh and oppressive treatment prejudicial to the public and particular individuals, the ownership of the copyright is made merely an instrumentality for the unreasonable restraint of trade or competition. And these principles have heretofore been applied in a number of decisions with respect to the provision for clearance in contracts between owners of films and exhibitors. Thus where the

clearances are established as a result of combination or conspiracy of numerous distributors or exhibitors or both, they have been held invalid. Youngclaus v. Omaha Film Board of Trade, D. C., 60 F.2d 538. See also First Nat. Pictures, Inc. v. Robison, 9 Cir., 72 F.2d 37; Vitagraph, Inc. v. Perelman, 3 Cir., 95 F.2d 142. But where the clearance results only from private contract between a distributor and an exhibitor, without unusual features, the provision has been upheld. Rolsky v. Fox Mid West Theatres, supra. See also Peoples Film Co. v. Minneapolis Film Board of Trade, [1] D.C.Minn. 1932; Shubert Theatre Players Co. v. Metro-Goldwyn-Mayer Distributing Corp. [1] D.C.Minn. 1936, and provision of consent decree in United States v. Ballaban & Katz, [1] D.C.N.D.Ill. 1932, Vol. 7 Fordham Law Rev. p. 199; Vol. 36, Columbia Law Rev. p. 646.

■ In applying the tests of the intent of the parties and the extent of the effect on the public, I have not been able to conclude that the stipulations for clearance in the present case are in unreasonable restraint of competition. A fourteen day clearance period is not uncommon in duration and there was nothing unusual in the agreement of the parties for it under the circumstances of this case. The evidence shows clearly enough that a substantial part of the patronage of the Edgewood Theatre comes from Ten Hills and its vicinity, and it was not unnatural, in accordance with the practice in the business, for the defendant exhibitor, the Lyndhurst Corporation, to request it. Nor was there anything unusual in its being granted by the five distributors in their several contracts. The evidence does not show that the parties acted otherwise than individually and separately in accordance with their own judgment as to their respective common interests, and the contracts made for 1939–1940 were substantially merely renewals of prior existing contracts between the parties. For 10 years or more the Edgewood Theatre had been doing business with these five distributors. It had been successful both for itself and for them in producing revenue; and any impairment of its gross revenues would obviously diminish the return to the several distributors. It was urged by counsel for the plaintiff that undue pressure was put upon the distributors to grant the clearance by reason of the large Durkee interests in

---

[1] No opinion for publication.

motion picture theatres in Baltimore; but I do not find sufficient evidence to support that view. It is of course possible that the distributors were influenced somewhat by the fact that the Durkee interests had long been good customers, but the evidence does not show that they exerted any undue pressure upon the distributors on that account, nor does it show any unusual preference to Durkee and his associates other than would naturally have been given to the Edgewood Theatre considered alone. It is also urged that the Edgewood Theatre intentionally contracts for more pictures than it can probably use. But again, in my opinion, the evidence fails to support this contention. I find no intent on the part of the distributors and the defendant exhibitor to unreasonably restrain competition by their contracts.

Nor do I think there is any substantial prejudice to the public interest. There is no evidence of any marked popular demand on the part of the residents of Ten Hills and vicinity for a motion picture theatre at that place, although it is doubtless a convenience to them to have a well equipped modern theatre there. The Westway is not unable to procure some pictures, but only unable to procure some 'or most of the better pictures from the seven distributors named in the complaint as early as it would like to have them. All the seven major distributors referred to in this case were willing to sell their pictures to the Westway for exhibition two weeks after the Edgewood or Alpha Theatres. It does not seem that the public in the vicinity of Ten Hills would be unduly prejudiced by the two weeks delay in seeing motion pictures at the Westway Theatre in their immediate vicinity, especially as in common with other residents of Baltimore they have the opportunity to see the first run a month or more earlier at a down town theatre, and the first subsequent run at any one of the neighborhood theatres within an area of two miles.

It is, however, true that the plaintiff suffers prejudice by not being able to obtain a first neighborhood run for feature films at his theatre. While it is able to procure some feature films from the R-K-O and also to obtain what is referred to as "spot booking" of films from other distributors, and also what are referred to as "shorts", it is not able to obtain a sufficient number of feature films to command a sufficient patronage to insure greater gross receipts. From the plaintiff's standpoint it is of course regrettable that it is not able to conduct its business on the most remunerative basis, especially as it has constructed a good theatre with all modern equipment. In view of the large number of motion pictures annually produced it would seem that the plaintiff ought to be able, as a result of negotiation, reasonable concessions and cooperation in the ordinary course of trade, to obtain a larger number of feature films than now seems possible. The impression that I get from the testimony is that the real obstacle consists in the practice of what is known as "block booking", that is, the contracting by the distributors with an exhibitor for a whole season's output, with minor exceptions. It is urged by the plaintiff that under present conditions it may be impossible for a new theatre to be built and successfully operated in any place within several miles of another theatre which may have contracted under block booking for practically all new films, except with the objectionable clearance provisions. Of course this may be the result in any given case and is alleged to be in that of the plaintiff; but there is evidence in this case that such a condition does not ordinarily prevail, there being numerous instances where in recent years new motion picture theatres have been opened in Baltimore City and are now being successfully operated. Nor does the evidence show that it is impossible for the plaintiff to successfully operate its theatre as a second run neighborhood house, because there are many such theatres in Baltimore which apparently are operated with fair success. And it does not appear that the plaintiff has given a fair trial to business of that character. As has been noted, the plaintiff can obtain any or all pictures of the defendant distributors for exhibition after the two weeks clearance period. But however that may be, block booking has been held legal and unobjectionable as a trade practice, (Federal Trade Comm. v. Paramount Famous-Lasky Corp., 2 Cir., 57 F.2d 152) and its legality is not here directly in issue. Furthermore it is clearly the established law that the distributors have the right to select their customers (Federal Trade Comm. v. Beech Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co., D. C., 224 F. 566; Id., 2 Cir., 227 F. 46; Arthur v. Kraft-Phenix Cheese Co., D. C., 26 F.Supp.

824), and therefore the plaintiff has no absolute right to demand exhibition rights for the pictures of any of the distributors. Possibly it may be also said that the plaintiff's attitude in negotiating for pictures has been minatory rather than conciliatory.

With regard to the contract stipulation for clearance, the plaintiff's case is based principally, if not exclusively, on Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. The facts of that case are, however, very different from this. There the court was dealing with a situation where two exhibitor defendants controlling a large majority of first run theatres in several Texas cities served notice upon the large distributors, as a group, that the exhibitors would reduce the price of admission charge to their first run theatres unless the distributors in licensing subsequent run exhibitors required the latter to increase their admission charge, and restrict them from showing for one admission price two motion pictures, that is, so-called double features. An agreement on the part of the distributors to do so was condemned as an unreasonable restraint of trade. In concluding the discussion of the case under the heading of "The Protection Afforded by the Copyright Act to the Contracts between Interstate and the Distributors", the court said, 306 U.S. at page 230, 59 S.Ct. at page 476, 83 L.Ed. 610:

"A contract between a copyright owner and one who has no copyright, restraining the competitive distribution of the copyrighted articles in the open market in order to protect the latter from the competition, can no more be valid than a like agreement between two copyright owners or patentees. Straus v. American Publishers' Ass'n, supra [231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.1915A, 1099, Ann. Cas.1915A, 369]; Paramount Famous Lasky Corp. v. United States, supra; see Standard Oil Co. v. United States, 283 U.S. 163, 174, 51 S.Ct. 421, 425, 75 L.Ed. 926. In either case if the contract is effective, as it was here, competition is suppressed and the possibility of its resumption precluded by force of the contract. An agreement illegal because it suppresses competition is not any less so because the competitive article is copyrighted. The fact that the restraint is made easier or more effective by making the copyright subservient to the contract does not relieve it of illegality. Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107."

This language is relied upon by the plaintiff here as conclusive of the invalidity of the clearance provision in the contracts in this case. If it be conceded that the language standing alone and divorced from the context of the whole opinion is broad enough (as Mr. Justice Roberts in his dissenting opinion thought it was) to apply to the contracts in this case, nevertheless I conclude after a careful study of the whole opinion that it was not the effect of the quoted provision to create new, but only to apply old well established principles of the Anti-Trust Act to the facts of that case. The quoted paragraph from the opinion must, therefore, I think, be understood in relation to the case as a whole. So treated it seems clear that what was said was intended to be in answer to the contention of the defendants in that case, and to say that an agreement of itself in unreasonable restraint of trade was not saved from invalidity merely because a copyright was used as the instrumentality for the unlawful restraint.

The plaintiff also refers to, and to some extent relies upon, a recent case in the eastern district of Pennsylvania, Gittone v. Warner Bros. Pictures, Inc., D.C., 30 F.Supp. 823, where the district court found a violation of the Sherman Act in an attempt on the part of exhibitors and distributors to monopolize the motion picture business in Vineland, N. J., under contracts which made it practically impossible for a new theatre to be run in competition with two established theatres controlled by an exhibitor defendant. As this case is said to be now pending on appeal, it is sufficient to say that after a careful examination of it I find that it presents a different situation both on the law and facts.

I reach the conclusion of law that the plaintiff's bill in this case must be dismissed with taxable court costs allowed to the defendants. Counsel may present the appropriate order in due course.