**MILGRAM et al. v. LOEW'S, Inc., et al.**
**Civ. A. No. 10600.**

United States District Court
E. D. Pennsylvania.
Nov. 28, 1950.

Cohen & Cohen, Philadelphia, Pa., for plaintiffs.

Wolf, Block, Schorr & Solis-Cohen and Schnader, Harrison, Segal & Lewis, all of Philadelphia, Pa., for defendants.

Gray, Anderson, Schaffer & Rome, Philadelphia, Pa., for intervening defendants.

KIRKPATRICK, Chief Judge.

This is an action based upon the antitrust laws. The plaintiff, a partnership, is the owner of a drive-in theatre located within the limits of the city of Allentown, Pennsylvania. The original eight defendants are distributors and control the li-

censing of about 85 per cent of all first-class feature motion pictures in the United States. The intervening defendants are exhibitors and own or operate six motion picture theatres in downtown Allentown. The substance of the complaint is that the distributor defendants, acting in concert, have unreasonably restrained interstate commerce by refusing to license any feature pictures to the plaintiff on first run. The prayer is for injunctive relief, without damages.

The plaintiff's theatre, the Boulevard, was constructed in 1949 at a cost of a quarter of a million dollars. It is located in not unattractive surroundings within the city limits of Allentown, 2.4 miles from the business center of that city, 1.7 miles from the common boundary line between Allentown and Bethlehem and 4.4 miles from the business center of Bethlehem. In equipment, appointments and conveniences the theatre is probably one of the best drive-ins in the country. It can accommodate over 900 cars, with an estimated capacity of 2,500 patrons. The plaintiff, David E. Milgram, is an experienced operator and under his management the theatre has been conducted along lines consistent with the highest grade of moving picture entertainment.

The six theatres operated by the intervening defendants are all centrally located. Five of them, with a combined seating capacity of about 6,000, are suitable for the exhibition of first-run feature pictures. These defendants have no affiliations with each other or with any distributor and there is genuine competition by competitive bidding among them for first-run pictures.

Without exception, the distributors have refused to consider any bids from the plaintiff for first-run feature films and have stated with substantial unanimity that they will not license such films to him, even though he may offer (as he already has offered on two occasions) higher prices than could be obtained from the exhibitor defendants. Having denied the plaintiff the opportunity to bid for first runs, six of the eight distributors followed up their action by offering him second runs at a

uniform clearance period of 28 days after the first showing in Allentown.

The distributors all deny that there has ever been any agreement among them to exclude the plaintiff from first runs. Moreover, the responsible official in each organization testified that the decision to do so was made without any knowledge of similar action on the part of the others.

■ Some argument, based upon the precise form in which the question was put to one or two of the witnesses, was offered to support the literal truthfulness of their answers, but if it was intended by the branch managers to deny knowledge of the uniform course which was being followed by all with regard to the plaintiff, I cannot accept their testimony. The advent of a first-class drive-in theatre demanding first-run showings in the Allentown district created a novel problem of the keenest interest to every branch manager. It is incredible that each proceeded in ignorance of how the others were dealing with it. Certainly the exhibitors (who vigorously opposed the plaintiff's requests) knew what was being done by each distributor and the information would speedily get to the others through them, if no other way. There may or may not have been a direct interchange of information as to action and policies between them, but it is simply not possible that branch managers did not keep track of what their competitors were doing or that, if any one of them had licensed first-run pictures to the plaintiff, the others would not have known of it without delay. I find, therefore, that every distributor adopting and adhering to the uniform course of excluding the plaintiff from competing for first-runs did so knowing that the others were doing the same thing.

■ The burden of the prosecution in proving the conspiracy element in antitrust cases has been lightened and simplified to a marked degree by the decision of the Supreme Court in Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610, followed by United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, and American Tobacco Co. v. United States, 328 U.S.

781, 66 S.Ct. 1125, 90 L.Ed. 1575. It may be taken as settled that proof of concert of action is of itself sufficient evidence from which an "agreement", as that term is used in the Act, may be found. In practical effect, consciously parallel business practices have taken the place of the concept of meeting of the minds which some of the earlier cases emphasized. Present concert of action, further proof of actual agreement among the defendants is unnecessary, and it then becomes the duty of the Court to evaluate all the evidence in the setting of the case at hand and to determine whether a finding of a conspiracy to violate the Act is warranted. In the Interstate Circuit case the Court plainly said that a conspiracy could exist by adherence to a scheme of concerted action without any agreement. " * * * we think that in the circumstances of this case such agreement for the imposition of the restrictions upon subsequent-run exhibitors was not a prerequisite to an unlawful conspiracy. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." [306 U.S. 208, 59 S.Ct. 474.] In neither the Socony-Vacuum case, supra, nor the American Tobacco case, supra, the latter of which upheld a conviction under both Section 1 and Section 2 of the Act, 15 U.S.C.A. §§ 1, 2, was there any real evidence of agreement other than knowingly joining in a system of parallel activities by a number of defendants who were in a position to control the market for their product.

■ The decisions of the Court of Appeals for the Third Circuit are in full accord. In William Goldman Theatres v. Loew's, Inc., 150 F.2d 738, 745, the Court said, "Uniform participation by competitors in a particular system of doing business where each is aware of the other's activities, the effect of which is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the statutes before us." In Ball v. Paramount Pictures, 169 F.2d 317, 320, the same Court said, quoting from United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct.

915, 92 L.Ed. 1260, "It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." In the present case the evidence shows that the members of a group in full control of the supply of motion pictures in the market in which the plaintiff is endeavoring to compete are pursuing a uniform course of conduct the effect of which is to impose restrictions upon commerce, each with awareness that the others are also pursuing it. This is evidence from which an agreement may be found.

■ Of course, similarity of the business practices of defendants in an anti-trust case does not necessarily lead to the conclusion that they are in a conspiracy to violate the law. Given a concerted course of action the result of which is to restrain commerce, the charge that the agreement which may be inferred therefrom is a conspiracy in violation of the law must be tested by the reasonableness of the restraint and, upon this point, its scope and the objectives of the defendants are important considerations. If the Court be convinced that it "results from nothing more than common business solutions to identical problems in competitive industry, the similarity of conduct would not require the conclusion that a conspiracy existed", charge of the Court, affirmed in Fifth & Walnut, Inc., v. Loew's Incorporated, 2 Cir., 176 F.2d 587—an excellent statement, but it must be borne in mind that the problem of which the Court was speaking was a local one and the "common solution" reached made no attempt to go beyond the local situation. The principle is applicable to cases like Westway Theatre v. Twentieth Century-Fox Film Corp., D.C., 30 F.Supp. 830, affirmed 4 Cir., 113 F.2d 932, of which the Court of Appeals, in its opinion in Ball v. Paramount Pictures, supra, said "Westway concerned a peculiarly local situation in Baltimore." How far it is applicable to a case in which the common problem is industry-wide and the common solution is to eliminate completely one type of competition is another matter.

In the present case, the testimony offered by these defendants through their respective district managers makes it plain that what they àre doing is putting into effect in Allentown a general program adopted and adhered to by the directing heads of the industry to relegate drive-in theatres generally to a second-run status. It is a highly important point that all the distributors through their top sales executives (who testified by affidavits, admitted in evidence by stipulation) confirmed the action of the district managers and approved their reasons.

The defendants state the case, in their brief, as follows: "It is undisputed that the drive-in is a new and radically different medium for the exhibition of motion pictures. Its proper position in the complicated system of clearance and run which necessarily characterizes the distribution of motion pictures is not yet known, and must ultimately be found on the basis of experience and the judgment of businessmen charged with the responsibility of obtaining the most advantageous outlets for their products. At the present time, that judgment dictates that a neighborhood drive-in play on a subsequent run."

The defendants amplified this statement by testimony as to the reasons for the judgment reached. Primarily, they are apprehensive that the exhibition in a drive-in theatre of any good feature picture on its first run would depreciate the sales value of the picture, both for subsequent runs in the neighborhood and for first runs in other communities so that, even if the distributor could get a very good price for first runs from a drive-in, he would fail to get the maximum return from the picture. Another reason, not so strongly pressed, is the possibility that, unless prohibitively high guarantees were given, the returns from the first-run showing in a drive-in of any given picture, arising from percentage payments, would be less than if it were shown in a conventional theatre. Comparatively little was said about the protection of established customers against competition, though it was mentioned as a part of the whole problem.

. Whether they are right or wrong about these matters I would not attempt to say. It is, of course, possible that if it became common knowledge that first-class drive-ins were playing good features on first run, the reputation they now have for showing old and inferior films would be dispelled. It is also true that the revenue from second runs is a minor, (though not negligible) consideration, the "cream of the business" being in the revenue derived from the short term monopolies which the first-run theatres enjoy. Certainly the executives who testified know a great deal more about their business than any judge and they can make a better guess as to what might happen; but the fact remains that their opinions as to the effect of drive-in competition in the industry were purely conjectural. Apparently the experiment of licensing first territorial runs to drive-in theatres has never been made and no data are available. Nor, with regard to their effect upon the conventional first-run theatres, was any evidence produced to indicate to what extent the drive-ins take patronage away from them.

The objectives of these defendants and the grounds on which they justify the uniform practices adopted to attain them are essentially the same as those of the defendants in the Interstate Circuit case, supra. In fact the substance of the defendants' argument is to be found in Mr. Justice Roberts' dissenting opinion, in which it was pointed out that the restrictions condemned by the majority of the Court "were imposed to prevent destruction of the good will which made possible the continued exhibition of first run feature pictures and to avoid decrease of the revenue from those pictures * * *" [306 U.S. 208, 59 S. Ct. 478] and that they were essential to the realization of the full value of the defendants' property in the films the licensing of which they controlled.

The considerations moving the defendants to reject this plaintiff's bids, it will be seen, have, basically, nothing to do with the location, size, equipment, appointments or policy of operation of his theatre or of any particular drive-in theatre as

compared with others of the same type, nor with any local competitive situation. Of course, this case grows out of the demand of a single theatre owner and a local situation is incidentally, though only incidentally, involved, but the reasons for refusing him first-run pictures are wholly directed to the position of the drive-in theatre in the motion picture industry. The sum of the testimony is that the plaintiff is excluded from first-run bidding simply because his theatre is a drive-in. If the course which has been applied to him is adhered to generally (and, from the reasons given, the only possible conclusion is that it will be) no drive-in within 30 or 40 miles of any city anywhere will get first-run pictures.

■ In the present case the restraint is effected through the device of clearances. The question, however, is not whether the term of the 28 day clearances offered to the plaintiff is unreasonably long, but whether the total denial of first runs to the plaintiff is reasonable or unreasonable. As Judge Hand pointed out in United States v. Paramount Pictures, D.C., 66 F. Supp. 323, 345, clearances and runs are practically alike "and the practice of clearance is so closely allied with that of run as to make comment on the one applicable to the other."

In the Paramount case the District Court held that clearances, unlike price fixing agreements, are not unlawful per se. On appeal the Supreme Court did not consider the question because the government abandoned its position in that regard. It has, therefore, been generally accepted that there is no illegality in attaching to the licensing of a film an agreement that no competing theatre shall have the film until a certain agreed time has expired, and it has also been held that under certain conditions the protection of clearance may be given to a single theatre or to a group of theatres in a particular locality as against other theatres, although, as far as I know, the Supreme Court has never had occasion to rule upon the practice as applied to theatres rather than the pictures themselves. The opinion of the District Court in the Paramount case, however, made it clear

that what was said was intended to apply to clearances imposed in particular situations by reason of special considerations having to do with the pictures and theatres immediately involved. " * * * licenses between one distributor and one exhibitor with reasonable clearance provisions do not, in our opinion, involve anything unlawful", United States v. Paramount Pictures, District Court, opinion, supra, 66 F. Supp. at page 341. Both the District Court and the Supreme Court, in the Paramount case, unqualifiedly condemned any system of clearances which had "acquired a fixed and uniform character" and which were "made applicable to situations without regard to the special circumstances which are necessary to sustain them as reasonable restraints of trade." United States v. Paramount Pictures, 334 U.S. 131, 146, 68 S.Ct. 915, 924, 92 L.Ed. 1260.

Progress under the competitive system comes from the constant development of new forms and methods and their entry into free competition with the old. Unless, or until, they have been demonstrated to be detrimental to the public, they should so far as possible be allowed to find their proper place in the industry, rather than have a place assigned to them by a dominant group with monopolistic power. The erection of a fence around an industry to keep out newcomers is wholly repugnant to the policy which underlies our anti-trust legislation.

■ I am of the opinion that a restraint of commerce in the distribution of motion pictures which is imposed as a result of the adoption of a general policy, implemented by a system of clearances intended to operate uniformly throughout the entire field of exhibition and wholly to suppress a new form of competition, is an unreasonable restraint and I hold that these defendants, in imposing such a restraint, are violating the anti-trust laws.

I find no evidence of unlawful conduct on the part of the intervening defendants.

Judgment accordingly.

## On Requests for Findings

The parties have submitted a great many requests for findings of fact. Before an-

swering them it may be well to mention some general considerations which bear upon a number of the requests, which may be grouped according to their subject matter.

One such group deals with the matter of competition between the plaintiff's theatre and those of the intervening defendants. There is undoubtedly such competition, but how extensive it is is hard to say. Many patrons of the drive-in theatre are persons who for various reasons would very seldom attend theatres located in the heart of the city. Apparently no investigation or check has been made to determine the extent to which the drive-ins cut into the business of the other type. However, on the whole, I think that the competition, in the case of Allentown and Bethlehem at least, is substantial or would be if the Boulevard could get first-run pictures.

I think, however, that the matter of competition has much less importance in this case than the parties have given it. It is only one of the things which the Supreme Court in the Paramount case said was proper for consideration in determining whether in any given instance the imposition of a clearance upon a certain theatre is unreasonably restrictive, and the mere fact that competition exists does not always justify such discrimination. It has no bearing whatever upon the real issue presented in this case, namely, whether a general system of clearances, uniform in that if carried out it would deny first runs to every theatre of a certain type, with the object of eliminating first-run competition by such type of theatre, is a lawful restraint upon commerce. The testimony of the defendants' witnesses and the reasons given by them for the course which they have adopted make it clear that drive-ins generally will be excluded from first runs regardless of the competitive factors in any given situation.

For generally similar reasons, another group of requests, intended to form a basis for comparison between the plaintiff's drive-in and the Allentown theatres, is not particularly important. So far as the plaintiff's theatre is concerned, they are, of course, relevant because the chief basis for the defendants' refusal to give the plaintiff first runs seems to be their concern about the possible depreciation of the value of their product for second and subsequent runs in other theatres and the characteristics and general suitability of the plaintiff's theatre would have a bearing upon this point. These requests have already been answered in the foregoing opinion. The net result is that if any drive-in theatre is suitable for a showing of a feature picture on first run the plaintiff's is.

Comparison between it and the intervening defendants' theatres is futile. The two types of theatres are simply not comparable. If the Boulevard were a downtown theatre of the conventional type with no roof, no seats and no heating plant, comparison between it and a first-class theatre would advance the inquiry considerably. As it is, it is of no great help.