**FANCHON & MARCO v. PARAMOUNT PICTURES, Inc. et al.**

No. 11572.

United States District Court
S. D. California, Central Division.

Aug. 17, 1951.

Pacht, Tannenbaum & Ross, Bernard Reich and Robert I. Weil, Beverly Hills, Cal., for plaintiffs.

O'Melveny & Myers, Homer I. Mitchell and Philip F. Westbrook, Jr., Los Angeles, Cal., for defendants Paramount Pictures, Inc. and others.

Newlin, Holley, Tackabury & Johnston, Frank R. Johnston and Hudson B. Cox,

Los Angeles, Cal., for defendants Twentieth Century-Fox Film Corp. and others.

Loeb & Loeb and Herman F. Selvin, Los Angeles, Cal., for defendants Loew's, Inc., and others.

YANKWICH, District Judge.

Action for treble damages, instituted by Fanchon & Marco, Inc., a California corporation, with its principal place of business in Los Angeles, California, where it has operated since August 10, 1949, the Baldwin Theatre at 3741 La Brea Boulevard. The Baldwin is a modern building erected prior to August 10, 1949, seats approximately 1,800 persons and has adequate private and other parking facilities.

The complaint alleges that ever since the completion of the Baldwin, the plaintiff has been ready, willing and able to exhibit "the best" motion pictures at the earliest dates, and to operate as a "first-run" motion picture theatre. Upon the ground that the defendants have conspired to deprive the plaintiff of access to such pictures, in violation of Sections 1 and 2 of the Sherman Anti-Trust Act[1], treble damages are sought in the sum of $300,000, attorney's fees and costs.[2]

I

The Conspiracy Charged

Through dismissals, the number of defendants now remaining in the case has been reduced. We identify them briefly.

Paramount Pictures, Inc., a New York corporation, is engaged in *producing, distributing* and *exhibiting* motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States, including Los Angeles and San Diego, California, and in foreign countries.

Paramount Film Distributing Corporation, a Delaware corporation, and a wholly-owned subsidiary of Paramount Pictures, Inc., is engaged in *distributing* motion pictures in various parts of the United States, including Los Angeles and San Diego, California, and in foreign countries.

Loew's Inc., a Delaware corporation, is engaged in *producing, distributing,* and *exhibiting* motion pictures, either directly or through subsidiary or associated companies, in various parts of the United States, including Los Angeles and San Diego, California, and in foreign countries.

Universal Pictures Company, Inc., a Delaware corporation, prior to May 25, 1943, was a subsidiary controlled by Universal Corporation, which also was a Delaware corporation engaged in *producing* and *distributing* motion pictures in various parts of the United States, including Los Angeles and San Diego, California, and in foreign countries. On May 25, 1943, the two corporations were merged under the name of Universal Pictures, Inc.

Universal Film Exchanges, Inc., a wholly-owned subsidiary of Universal Pictures, Inc., or Universal Corporation, is a New York corporation, engaged in *distributing* motion pictures in various parts of the United States, including Los Angeles and San Diego, California, and in foreign countries.

United Artists Corporation, a Delaware corporation, is engaged in the *distribution* of motion pictures as above indicated as to other distributing corporations.

Twentieth Century-Fox Film Corporation, a New York corporation, is engaged in *producing, distributing* and *exhibiting* motion pictures in the manner indicated as to other corporations.

National Theatres Corporation, a subsidiary controlled by Twentieth Century-Fox Film Corporation, is a Delaware corporation, with a place of business at 1609 West Washington Boulevard, Los Angeles, California, engaged in *exhibiting* motion pictures, either directly or through associated corporations, in various parts of the United States, and more particularly in several of the Western States, including California, and the cities of Los Angeles and San Diego.

National Theatres Amusement Company, Inc., a Delaware corporation, is engaged in *exhibiting* motion pictures in various.

1. 15 U.S.C.A. §§ 1, 2.

2. 15 U.S.C.A. § 15.

parts of the United States, and more particularly in several of the Western States, including California and the cities of Los Angeles and San Diego.

Fox West Coast Theatres Corporation, a wholly-owned subsidiary of National Theatres Corporation, is a California corporation, with its principal place of business at 1609 West Washington Boulevard, Los Angeles, California, engaged in *exhibiting* motion pictures in various parts of the United States, and more particularly in several of the Western States, including California, and the cities of Los Angeles and San Diego.

All the defendants before the court and those against whom the action was dismissed, are engaged *in the production and/or distribution of motion pictures*.

During the trial, the defendants Fox West Coast Theatres, National Theatres Corporation and National Theatres Amusement Company, Inc., were referred to as Fox West Coast. Directly or through subsidiary corporations, they own control and are affiliated with some 250 theatres in Los Angeles and vicinity.

The complaint charges that the defendants for many years past combined and conspired with each other to restrain and monopolize trade and commerce, and have, in effect, unreasonably restrained and monopolized trade and commerce in the production, distribution and exhibition of motion pictures in the United States, including California and the cities of Los Angeles and San Diego and vicinity.

The acts of the defendants by which the plaintiff claims to have been injured in its business are stated in this manner:

(a) Refused to license, sell or furnish motion pictures to the plaintiff for exhibition on a first-run basis, and to permit the plaintiff to compete for such run in open and fair competition with other theatres.

(b) Arbitrarily fixed the run, protection or clearance (the time which elapses between runs of the same picture in different theatres) of motion pictures in favor of other theatres, including Fox West Coast, and in discrimination against the plaintiff and refusing to permit the plaintiff to compete for play dates in open and fair competition with other theatres or the exhibitor defendants.

(c) Refused to license, sell and furnish motion pictures to the plaintiff on any other basis than for exhibition 21 or more days after they had first been exhibited first-run in Los Angeles.

(d) Refused to permit the plaintiff to compete for such pictures as to all terms of licensing on a picture-by-picture, theatre-by-theatre basis in open and fair competition with other theatres.

(e) Favored Fox West Coast and other exhibitor-defendants and discriminated against the plaintiff with respect to the terms of license of motion pictures, including selection, run and clearance, designation of play dates, rentals, charges, allowances, price, road show engagements, classification of films and other conditions and privileges in connection with exhibition of motion pictures.

It is the plaintiff's claim that these practices have resulted in illegal restraints which have impaired, injured and damaged them, and that the injury and damage would continue as long as the practices continue. For this reason, the plaintiff seeks injunctive relief against the continuance of these illegal acts, in addition to the damages already referred to.

## II

### The Treble-Damage Action

Having had occasion very recently to discuss in comprehensive opinions the scope and object of the anti-trust statutes [3],

---

3. Balian Ice Cream Co. v. Arden Farms, 1950, D.C.Cal., 94 F.Supp. 796; F. & H. Ice Cream Co. v. Arden Farms Co., D.C. Cal.1951, 98 F.Supp. 180; United States v. Richfield Oil Corp., D.C.Cal.1951, 99 F.Supp. 280.

A brief, yet comprehensive, statement of the restraints on interstate commerce which may arise from restrictive practices relating to the exhibition of motion pictures is given in White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 1942, 129 F.2d 600, 604: "The competitive freedom of such a market, in both buying and selling, is one of the principal things which the Sherman Act was

it will not be necessary to discuss in detail the philosophy behind them, the aim of which is to maintain our economy competitive. There has been much speculation among economists and writers as to whether the type of competition envisaged by the authors of the Sherman Act conforms to the pattern which our industrial development has taken.[4]

The treble-damage action was intended not merely to redress injury to an individual through the prohibited practices, but to aid in achieving the broad social object of the statute.[5] In order to establish a right to recover, the plaintiff in such action must show (a) a conspiracy to monopolize or restrain interstate commerce, and (b) injury to his business by such acts.[6] If the prohibited acts which have damaged him have been established in a judgment or decree obtained by the Government in a criminal prosecution or an equity proceeding under the anti-trust statutes, the plaintiff may, in aid of his cause, rely upon such judgment or decree, in proving the existence of the prohibited acts. The law specifically provides that such judgment or decree "shall be prima facie evidence against such defendant in any suit or pro-

ceeding brought by any other party against such defendant under said laws as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto".[7]

The Supreme Court has very recently given us an authoritative interpretation of the meaning of this clause.[8] Speaking of the effect to be given to a judgment obtained by the Government in a criminal prosecution, the Court said: "To establish their prima facie case it therefore was necessary for petitioners only to introduce, in addition to the criminal judgment, evidence of the impact of the conspiracy on them, such as the cancellation of their franchises and the purpose of General Motors in cancelling them, and evidence of any resulting damages." [9]

The plaintiff in the case before us does not rely solely upon the decree entered in the Paramount case.[10] It offered, in addition, evidence relating to the practices obtaining in motion picture distribution for a long period of time dating back of 1920. In the main, however, so far as the "impact" of these practices on the plaintiff are concerned, they amount to the refusal to license the plaintiff as a first-run motion pic-

intended to protect. Where that freedom is interfered with, by a contract, combination, or conspiracy, that from a public viewpoint harmfully restrains competition, or by an attempt, combination or conspiracy to monopolize, that has a direct wrongful purpose or other probable prejudicial consequences to the public interest, the force of the Sherman Act may be called into operation against it, on the basis of the public wrong involved, through the public or private remedies which the Sherman and Clayton Acts provide."

4. Most of the literature on the subject is given in G. E. Hale, Size and Shape of the Individual Enterprise as a Monopoly, University of Illinois Law Forum, Vol. 1950, Winter, No. 4, p. 515. And see, M. A. Adelman, Effective Competition and the Antitrust Laws, 1941, 61 Harvard Law Rev., p. 1289; Edward H. Levi, The Antitrust Laws and Monopoly, 1947, 14 U. of Chicago Law Review, p. 153; Eugene V. Rostow, The New Sherman Act: A Positive Instrument of Progress, 1947, 14 U. of Chicago Law Review, p. 567; Eugene V. Rostow, Monopoly

Under The Sherman Act, 1949, 43 Ill. Law Rev., p. 745.

5. D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 1915, 236 U.S. 165, 173, 35 S.Ct. 398, 59 L.Ed. 520; Fifty Years of Sherman Act Enforcement, 1938, 49 Yale Law Journal, p. 284, 286; see additional references in Balian Ice Cream Co. v. Arden Farms, supra, Notes 20, 21, 22.

6. D. R. Wilder Mfg. Co. v. Corn Products Refining Co., supra, Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236; see, Thomas C. McConnell, The Treble Damage Action, in University of Illinois Law Forum, Vol. 1950, Winter, No. 4, p. 256 et seq.

7. 15 U.S.C.A. § 16.

8. Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 71 S.Ct. 408.

9. Emich Motors Corp. v. General Motors Corp., supra, 340 U.S. at page 571, 71 S.Ct. at page 415.

10. United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.

ture house and to license, sell or furnish pictures to them on any other basis than a 21-day basis. These restrictions concern the basic problem of clearances and runs, which characterizes the manner of distributing motion pictures.

A clearance is a period of time which elapses between the runs of the same feature in a particular area or in specified theatres.

Runs are successive exhibitions of a feature in a given area, first runs being the first exhibitions in that area, the second run being the subsequent one, and so forth, and include successive exhibitions in different theatres, even though such theatres may be under a common ownership or management. Clearances and runs are related to each other.[11]

The Supreme Court has aptly characterized clearances in one sentence: "Clearances are designed to protect a particular run of a film against a subsequent run." [12]

In another case, the Court has stated: "It is in part designed to protect the value of the license which is granted." [13]

The nature of the product with which motion picture distributors and exhibitors deal is such as to require the regulation of the manner of exhibition. It would be economically unwise, even if feasible, to throw the product on the market on the same day in all the thousands of theatres in the United States, or even in a theatregoing area like Los Angeles. The average minimum number of prints for a feature picture is 280, the maximum is 400. These must serve 15,000 accounts. For the Los Angeles area, 12 prints are reserved, which number, after the 21-day playoff, is increased to 30. The minimum cost of a print is $165.

So preference must be given to certain theatres. And to make such preference effective, the exhibition of pictures at other theatres must be limited to a lapsed period after exhibition of the picture at first-run theatres. Because motion pictures play in units of weeks, the availability period is described in multiples of seven, there being seven, fourteen and twenty-one day periods after first runs elsewhere.

This pattern obtains not only as between different localities, but in theatres located in the same community. And, generally, the rule in the industry has been to license motion pictures upon this basis. No cases exist which hold that the system, *in itself*, is a violation of anti-trust laws. To the contrary, all the decisions which have come from the higher courts postulate the legality of these restrictions, condemning only unreasonableness in the preferences.[14]

So he who claims to have been injured by such preference must show (a) that the preference was the result of concert of action between the defendants, (b) that it was unreasonable and not based upon the various factors which courts have considered as reasonable considerations entering into the determination,—such as admission price, location of a theatre, its policy with regard to the showing of double features, gift night and other exploitation methods, the rental terms, the extent to which comparative theatres compete with each other,—and (c) that he has been damaged by such action.

As to the manner of proof, the Courts have adopted a liberal attitude, and have

11. United States v. Paramount Pictures, Inc., D.C.N.Y.1946, 66 F.Supp. 323, 345.

12. United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 144, 68 S.Ct. 915, 923, 92 L.Ed. 1260. And see, Bertrand, Evans and Blanchard, The Motion Picture Industry, A Pattern of Control, 40–41 (TNEC, Monograph No. 43, 1941) cited in Schine Chain Theatres v. United States, 1947, 334 U.S. 110, 121, 68 S. Ct. 947, 92 L.Ed. 1245.

13. Schine Chain Theatres v. United States, 1947, 334 U.S. 110, 121, 68 S.Ct. 947, 953, 92 L.Ed. 1245.

14. United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 144–148, 68 S. Ct. 915, 92 L.Ed. 1260; Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 121, 68 S.Ct. 947, 92 L.Ed. 1245; Fifth and Walnut, Inc. v. Loew's, Inc., 2 Cir., 1949, 176 F.2d 587; United States v. Paramount Pictures, Inc., D.C.N.Y. 1946, 66 F.Supp. 323, 341–343.

permitted inferences of *joint* action to be drawn from *parallel* action.[15]

■ But, regardless of burden of proof, in the last analysis, the trier of facts must be satisfied that the practices which the plaintiff claims to have injured him were the result of joint action.[16] When this is shown, the measure of damages is the plaintiff's loss, determined either by direct proof of such loss or by proof of what another exhibitor similarly situated made.[17]

### III

### The "Staggered" Distribution

All recent actions of this type stem from the decree secured by the Government in its equity action against Paramount.[18] The plaintiff relied on this decree and on two consent decrees against certain defendants not affected by the main decree.

■ But, even when there is reliance on the decree for proof of *all* the facts other than damages [19], the Court must find, especially where (*as here*) the claim arose *after* the decree, that the particular practice continued to the institution of the action, to the damage of the plaintiff.

Supplementing the Findings in the decrees, plaintiffs have gone back many years in an attempt to show that there was in effect in the Los Angeles area, a zoning system which originated during the days of the N.R.A. Code. And it is their contention that the practices have continued to the present time, that their exclusion from first-run pictures is the result of a conspiracy on the part of the defendants to continue the zoning policy to date and to give preference to the exhibitor-defendants upon conditions of inequality with the plaintiff.

Otherwise said, the plaintiff maintains that certain "favored" theatres, similarly situated, drawing from the same type of audiences, and having similar or even inferior seating capacity and appointments, have been given unjustified preference. So we have to determine whether the practices which the decree in the Paramount case condemned, and which the plaintiff sought to prove by evidence *aliunde,* have continued to the present time, whether they are the result of agreement, and whether the plaintiff has been damaged by them.

### IV

### Clearances and Runs

We start with the postulate that an exhibitor does not have the right to *compel* a motion-picture producer to give him a preferred run. Of necessity, as the motion picture industry could not operate under a system of simultaneous releases, clearances and runs are not illegal *per se.* And

15. Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 221–226, 59 S.Ct. 467, 83 L.Ed. 610; United States v. Masonite Corp., 1942, 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461; William Goldman Theatres, Inc., v. Loew's, Inc., 3 Cir., 1945, 150 F.2d 738, 743; Ball v. Paramount Pictures, Inc., 3 Cir., 1948, 169 F.2d 317, 320; Bordonaro Bros. Theatres v. Paramount Pictures, Inc., 2 Cir., 1949, 176 F.2d 594, 596–597. See Note, Conscious Parallelism—Fact or Fancy, 3 Stanford Law Rev., 1951, p. 679; Moses Lasky, Metaphysics v. Reality in the Anti-Trust Law, 26 Journal, State Bar of Cal., 1951, p. 28, 35–38.

16. Fifth and Walnut, Inc., v. Loew's, Inc., 2 Cir., 1949, 176 F.2d 587, 594; Westway Theatre, Inc., v. Twentieth Century-Fox-Film Corp., D.C.Md.1940, 30 F. Supp. 830, 834–835; and see, Binderup v. Pathe Exchange, 1923, 263 U.S. 291, 311–312, 44 S.Ct. 96, 68 L.Ed. 308; United States v. Griffith, 1948, 334 U.S. 100, 105–107, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Crescent Amusement Co., 1944, 323 U.S. 173, 183–185, 65 S.Ct. 254, 89 L.Ed. 160.

17. Bigelow v. RKO Pictures, 1946, 327 U.S. 251, 260–266, 66 S.Ct. 574, 90 L.Ed. 652; William Goldman Theatres v. Loew's, Inc., 3 Cir., 1948, 164 F.2d 1021; Milwaukee Towne Corporation v. Loew's, Inc., 7 Cir., 1951, 190 F.2d 561; and see, Note, The Requirement of Certainty in the Proof of Lost Profits, 1950, 64 Harvard L. Rev., pp. 317–325.

18. United States v. Paramount Pictures, Inc., D.C.N.Y.1947, 70 F.Supp. 53.

19. Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 71 S.Ct. 408.

the criteria to follow are those adopted by the Supreme Court in the Paramount [20] and Schine [21] cases. They require us to determine, in each *instance,* whether a particular run is unreasonable.

In determining the matter after a complete trial, the question of the burden of proof and of inferences from similar actions becomes academic.

In order to allow recovery, we must be satisfied from the record that the restrictions which the defendants have imposed on the plaintiff are the result of concert of action, and are unreasonable. Infer-ence from similarity loses its importance when met by positive denials of such action.[22] More, in the realm of commerce, similarity of action, at times, may be the result not of previous agreement, but of solving an identical situation in a similar manner. The facts must be assayed in the light of these principles.

The evidence shows clearly that the producer-defendants make and release the greatest portion of major pictures in the American market. This is evidenced by the following table covering the five-year period 1945–1949.

Features Released by Major Companies

1945–1949, inclusive

|  | 1945 | 1946 | 1947 | 1948 | 1949 |
| --- | --- | --- | --- | --- | --- |
| Columbia | 38 | 51 | 49 | 39 | 52 |
| M–G–M | 31 | 25 | 29 | 24 | 30 |
| Paramount | 23 | 22 | 29 | 25 | 21 |
| RKO Radio | 33 | 40 | 36 | 31 | 25 |
| 20th Cen.–Fox | 27 | 32 | 27 | 45 | 31 |
| United Artists | 17 | 20 | 26 | 26 | 21 |
| Universal | 46 | 42 | 33 | 35 | 29 |
| Warner Bros.–First National | 19 | 20 | 20 | 23 | 25 |
| Total | 234 | 252 | 249 | 248 | 234 |

A comparative table shows that the pictures released by the majors constitute the largest portion of the pictures released in the United States market during the same five-year period.[23]

Features Released in United States Market

1945–1949, Inclusive

| Year | Total Releases | Major Companies | Independent Companies | Major Companies | U. S. Produced | Imported | Independent Companies | U. S. Produced | Imported | U. S. Produced | Major Companies | Independent Companies | Imported | Major Companies | Independent Companies |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1949 | 479 | 234 | 245 | 234 | 224 | 10 | 245 | 132 | 113 | 356 | 224 | 132 | 123 | 10 | 113 |
| 1948 | 459 | 248 | 211 | 248 | 225 | 23 | 211 | 141 | 70 | 366 | 225 | 141 | 93 | 23 | 70 |
| 1947 | 486 | 249 | 237 | 249 | 234 | 15 | 237 | 135 | 103 | 369 | 234 | 135 | 118 | 15 | 103 |
| 1946 | 467 | 252 | 215 | 252 | 239 | 13 | 215 | 139 | 76 | 378 | 239 | 139 | 89 | 13 | 76 |
| 1945 | 377 | 234 | 143 | 234 | 228 | 6 | 143 | 122 | 21 | 350 | 228 | 122 | 27 | 6 | 21 |

20. United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.

21. Schine Chain Theatres v. United States, 1947, 334 U.S. 110, 68 S.Ct. 947, 92 L. Ed. 1245.

22. Fifth and Walnut, Inc., v. Loew's, Inc., 2 Cir., 1949, 176 F.2d 587.

23. See, McDonough and Winslow, The Motion Picture Industry: United States v. Oligopoly, 1949, 1 Stanford Law Review, p. 385.

In the circumstances, some conclusions may be stated as to the "first-run" policy, which is the nub of the controversy.

The first run establishes a picture. The advertising for it is intense over the first-run area. The income from first-run is highest, after which, the law of diminishing returns begins to work. At times, the rental for a subsequent run is less than the cost of a print. The "staggered" release plan helps the exhibitor, who benefits by the prestige established for the picture by the preceding runs. It also enables a larger number of persons to see a picture at a price within their reach, as the later showings are in theatres in the lower price range.

So, on the whole, the plan protects the producer, the exhibitor as well as the public. Indeed, a system of "free trade", as I called it during the trial,—i.e., a system which would enable *any one* to bid on the same conditions for a first-run would result in a monopoly for those paying the highest price. And a simultaneous release would result in an anarchy that would destroy both the producer and the exhibitor, even if it were financially possible to print 15,000 prints needed for a successful picture, or 6,500 prints for an unsuccessful one. Of course, if the practice were illegal, its economic soundness could not save it from condemnation. But, as the law condemns only the unreasonable application of this and other methods relating to runs and clearances,—these considerations have an important place in determining the controversy.

In assaying the policy in practice, certain other factors must be taken into account. Specific theatres in an area may lend themselves to specific treatment. As one of the witnesses testified, class or art pictures, pictures which, by reason of their unusual elements, appeal not to the masses, but to an "artistic elite" as it were,—such as the W. Somerset Maugham series ("Trio" and "Quartet"), "Red Shoes", "Kon-Tiki", "Ace In The Hole",—do better in smaller theatres which have a small overhead, and do a minimum of advertising. The average peak exploitation period of a picture being fifteen weeks, the topics with which

pictures of this character deal being more universal, they "wear" better. Persons interested in them are as likely to patronize the theatre in which they are shown months after their first exhibition as at the premières. The phenomenon is akin to what obtains as to the legitimate stage, where,—to mention recent great successes, —one is just as delighted *now* with the simple humanness of Mary Martin's characterization of Nellie Forbush in "South Pacific" or with Claude Rains' great impersonation of Rubashov in "Darkness at Noon", as if one were one of the elect who saw them when the plays were first produced.

When we come, however, to what the same witness called "mass pictures",—pictures designed for mass popular entertainment, their subject is usually topical. They have a contemporary appeal which may not be very durable. And they may do better in certain selected theatres in large metropolitan areas where, through intensive advertising, the use of klieg lights and other devices of showmanship, the interest of the average patron is aroused.

Recent research indicates that the bulk of the patrons for these mass pictures comes from the youth of the land. Notoriously, the mature groups from the age of 30 on were, even before the rapid development of television, staying away from the motion picture theatres.

One witness expressed the view that the availability of a larger seating capacity is not very important, because, in the Los Angeles territory, seating capacity has increased too rapidly, and out of proportion with the increase in the number of theatregoers. Indeed, throughout the year, a theatre would not reach capacity in more than two or three instances.

The choice of medium of distribution also requires that the policy in regard to first-runs be consistent. Unless a producer or distributor follows a consistent policy and knows that a definite number of first-run outlets exists, he could not send out a steady flow of products. From the standpoint of the theatre owner, also, a sporadic first-run policy would be harmful in the long run. For, unless his patrons knew

that the policy followed, whether first-run or other, was general, their own pattern in patronizing the theatre would be disturbed. We are all creatures of habit. If, when we see the advertisement of a picture, we know that, in due time, it will reach our favorite theatre, we are not concerned about runs elsewhere. For we have the assurance that the neighborhood theatre,—the theatre we patronize,—will, in due time, show the picture. But if the neighborhood theatre should change its policy from time to time or from picture to picture,—because the operator might choose to have a variable policy,—the pattern for the patrons would be broken. The patrons would have to inquire as to each picture what the policy of the theatre would be. And the result possibly would be that, in their uncertainty, they would move their patronage to other theatres having a more consistent policy. And the theatre would be harmed. Instead of benefiting by the prestige of the picture established by prior runs, the theatre would have to resort to the type of advertising which first-run theatres are engaged in.

So it is quite evident that the first-run policy depends for its success on uniformity. And such uniformity applies not only to run, but also to price charged. For the first-run theatres (in downtown Los Angeles, in Hollywood and in the Wilshire District, which comprise the primary first-run areas in Los Angeles), charging higher prices, could not be expected to participate in an advertising campaign from which some suburban theatre in a newly-developed district,—which charges a lower price

of admission,—would benefit. The producer and distributor must seek outlets in definite areas in Los Angeles, as do most of the defendants in this case, because they present the best opportunity for the uniformity of which we have spoken. And if all the producer-defendants have fallen into the practice, it is because the situations which confronted them were identical, and the same solution presented itself.

█ The force and logic of these considerations find support in the fact that the plaintiffs themselves are the beneficiaries of a first-run license for Paramount productions for their two theatres in Los Angeles, which was sustained by Judge Harry C. Westover in a case instituted in our court by Paramount Pictures Theatres Corporation.[24] The doctrine which prevents one participating in an alleged illegal scheme from questioning its legality does not apply to this type of action.[25] Nor is the case governed by the rule that one who accepts the benefits of an arrangement is not in a position to question it in so far as it may harm him.[26] For we do not believe that the doctrine goes so far as to hold that one who accepts a role in a system of distribution affecting one community is precluded from seeking similar benefits elsewhere. The plaintiff is not questioning the first-run policy in the Los Angeles area. He would merely broaden it to incorporate into it the Baldwin.

Granted that the first-run policy, as limited to downtown Los Angeles, Hollywood and the Wilshire District, benefits the plaintiff, he is not precluded from seeking

24. Paramount Pictures Theatres Corp. v. Partmar Corp., D.C.Cal.1951, 97 F.Supp. 552.

25. Fashion Originators' Guild of America v. Federal Trade Commission, 1941, 312 U.S. 457, 467-468, 61 S.Ct. 703, 85 L.Ed. 949. "The alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 214, 71 S.Ct. 259, 261.

And see, Milgram v. Loew's, Inc., D.C. Pa.1950, 94 F.Supp. 416, 419. Moore v. Mead Service Co., 10 Cir., 1951, 190 F.2d 540. The decision of the Court of Appeals for the Ninth Circuit in First National Pictures v. Robison, 9 Cir., 1934, 72 F.2d 37, in so far as it may express a contrary doctrine, need not be followed, in view of the later decisions of the Supreme Court just cited, holding the contrary. In reality, however, all that the case decided was that the exhibitor in that case having *agreed* to a zoning system, could not complain when, pursuant to the same policy, a *rezoning* took place which harmed him.

26. Gray v. Commodity Credit Corp., D.C. Cal.1945, 63 F.Supp. 386, 397-398; affirmed on appeal in Gray v. Commodity Credit Corp., 9 Cir., 1947, 159 F.2d 243.

similar benefits for the Baldwin. However, his participation in the first-run scheme, as applied to the Los Angeles area, may be taken into consideration in determining the reasonableness of the scheme. For it is unlikely that one would *willingly* take part in a procedure, then attack it as unreasonable when applied to him elsewhere.

The modification of the pattern may, in an indirect way, harm the plaintiff in their exhibition of Paramount Pictures, in their two metropolitan theatres. But, in seeking this result, the plaintiff is not alone. Evidence in the record indicates that during a period of almost two years preceding the institution of this action, beginning late in December, 1948, before the Baldwin Theatre was actually completed, half a dozen requests for "day-to date" availability with "first-run" Los Angeles were requested from Paramount by operators of theatres outside the three areas,—one such request coming from the plaintiff as owner of the Rio Theatre. Similar requests were made of other defendants.

█ It follows that, in addition to the factors enumerated, plaintiff's own action speaks for the need for a preferential system of "staggered releases",—as one of the witnesses called it. Indeed, when this witness was on the stand, counsel for the plaintiff conceded that they were not attacking the "first-run" system, but sought to have it extended to another area so as to include the Baldwin. The impracticability of simultaneous release has already been adverted to. To this, we add the fact that, even if such release were economically feasible, it would so unduly shorten the exploitable life of each motion picture that to supply the demand, the product would have to be greatly increased. It is common knowledge that, even at the present time, it is difficult to find enough stories which lend themselves to motion picture treatment. The feverish competitive bidding by studios for "best sellers", the constant resort to those escapes for mediocrity, —the historical incident as a source of inspiration, the life portraits of popular figures, the attempts to dramatize momentary topics of discussion,—are all indicative of the problem which a demand for a greater number of pictures might create.

All these factors warrant the conclusion that the system of runs and clearances as it functions now in the Los Angeles area, is *not only necessary,* but is also, in all respects, a reasonable attempt to solve a difficult and exacting problem.

### V

### "First-Run" Limitations

What has gone before shows that the specific facts on which the limitation of first-runs to definite areas in the Los Angeles district is dictated by real and definite conditions which justify it, and that it has been applied uniformly and without discrimination.

This does not mean that there have not been apparent exceptions or deviations. But they can be justified, on the whole.

The extensions of first-run to other *apparently* urban areas have been what might be called "the peripheral" kind. They concerned theatres which, whether they are or are not within the city limits of Los Angeles, are in neighborhoods which are distinct communities with a life of their own. Los Angeles, because of its great geographical extent,—which has supplied the folklore for so many "Los Angeles City Limits" jests,—has developed many concentrated, self-contained areas of population, which have a communal life of their own, with business and trade centers, home or civic activities of their own, and even regional local newspapers. Some of them have professional groups who confine their practice to the locality, and are banded into regional associations. People live, often earn their livelihood, shop and amuse themselves within a confined district. The phenomenon has called for the decentralization of business. And regular self-sufficient business and trading centers have grown up with all the facilities needed for metropolitan living. Indeed, some of our large department stores have established branches to forestall competition. In many instances, these communities are as separate and distinct from what one witness has called "the urban core" as if they were independent municipalities. We il-

lustrate by mentioning some with which comparisons have been made. Westwood Village has become a unique university community because of the location of the University of California at Los Angeles there, with a typical college-town atmosphere, although it is a part of the City of Los Angeles. San Pedro, because it is the Port of Los Angeles, has all the characteristics of a seaport town, although it is not a distinct municipality. So has Wilmington which adjoins it. They, too, belong together. Ocean Park, although a part of the City of Los Angeles, is a beach resort as distinct as Santa Monica, which is a separate municipality.

New districts are constantly being developed. The patronage of the theatres located in these districts is drawn from the residents of the districts, not so much because of distance to metropolitan theatres, but because the habit pattern of the residents ties their entire lives, including their entertainment to the locality. These theatres are, therefore, not so competitive with the large metropolitan theatres as are the theatres in the urban "core". Theoretically, as to other districts, Los Angeles is a "city on wheels", and mere distance from another theatre may not give assurance that the residents *will not* seek their entertainment at the metropolitan theatres.

So we have an important fact in the actual living habits of people from which the theatre-goers are drawn,—namely, the existence of regular oases of population with separate lives,—which calls for a definite method of treatment in the matter of motion-picture exhibition, and is responsible for the differentiation between theatres.

Courts do not condemn classifications so long as a reasonable ground exists for either an inclusion or exclusion of groups or territories. Long ago, Mr. Justice Holmes insisted that "A lack of abstract symmetry does not matter",[27] when it comes to classification. He added: "The question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class".[28]

Some inequality is inherent in any differentiation or classification. And its existence is not a valid ground for invalidating a reasonable classification, even when the question of due process is involved.[29] All that the courts require is that the classification be not arbitrary. If it is not, and it is based upon facts which warrant separate treatment, the classification will be upheld, despite absence of *perfect* equality. For the problem to consider is "not a geometrical equation" between the included and excluded group or territory, but "whether the difference does injustice to the class generally, even though it bear hard in some particular case".[30]

In consequence, allowance must be made for what Mr. Justice Holmes, in the case just cited, called "a little play in its joints." [31] Otherwise, the machinery would not work.

In assaying the particular limitation, we find that it is based on demographic factors with which students of population are familiar. And the conclusion is warranted that there are inherent differences in the different localities in the Los Angeles area which warrant the general exclusion from first-runs of certain urban theatres.

Whatever may have been the practice of the defendants before the decree of the statutory court, it is quite evident that since then, and the entry of the consent

27. Patsone v. Com. of Pennsylvania, 1914, 232 U.S. 138, 144, 34 S.Ct. 281, 58 L.Ed. 539.

28. Patsone v. Com. of Pennsylvania, supra, 232 U.S. at Page 144, 34 S.Ct. at page 282, 58 L.Ed. 539.

29. People of State of N. Y. ex rel. Bryant v. Zimmerman, 1928, 278 U.S. 63, 73–77, 49 S.Ct. 61, 73 L.Ed. 184; Skinner v. State of Oklahoma, 1942, 316 U.S. 535, 540, 62 S.Ct. 1110, 86 L.Ed. 1655; Railway Express Agency v. People of the State of New York, 1949, 336 U.S. 106, 112–117, 69 S.Ct. 463, 93 L.Ed. 533.

30. Bain Peanut Co. v. Pinson, 1931, 282 U.S. 499, 501, 51 S.Ct. 228, 75 L.Ed. 482.

31. Bain Peanut Co. v. Pinson, supra, 282 U.S. at page 501, 51 S.Ct. at page 229, 75 L.Ed. 482.

decrees, there has been an abandonment of the condemned distributing policies, such as "zoning", "block-booking", "key" deals, and the like, a revision of clearances and the establishment of a system of picture-by-picture exploitation. As is shown in the record, the pattern is practically the same as to all producers. When a picture is ready for release, notices are sent out to exhibitors and competitive negotiations begin, as to the first-runs or pre-release showings. The producer, or the agency through which he distributes, selects from the offers the "best deal" from his standpoint, considering fixed price or percentage, length of run and other factors. The exhibitor determines his own admission price. The offer, in some instances, states the price ordinarily charged. It was explained that this is necessary. For if the offer is on a percentage basis, the admission to be charged by the theatre may become a factor in its acceptance, as it would in any joint venture in which remuneration is measured by income. If the exhibitor has several theatres, the price for the run is negotiated as to each picture, although agreement may be reached as to all theatres at the same time. At times, in the case of pictures exhibited on a percentage basis, there is a sliding scale, depending on the expense of the house, the ultimate rental varying with variations in such expense. From the date of the decree in the antitrust action, December 31, 1946, and, in some instances, from the date of the opinion which preceded it, June 11, 1946, these changes in method of exhibition began to be put into effect. The process has continued to date.

Any present preferences which appear in the record as to "first-runs" are due to the general conditions already discussed which call for different classification and treatment, and to the special additional factors just named.

On the whole, the "first-run" practice, as applied to the Los Angeles area and as it affects the plaintiff, is not unreasonable. If the exclusion of the Baldwin Theatre from it harms the plaintiff, the result is not consequent upon any illegal concerted action of the defendants, but is fortuitous and not actionable in this or any other type of action. It is traceable to the fact that the Baldwin, unlike other theatres in areas with which it is sought to compare it, is not in an integrated community, and that there are distinct limitations to the commercial zone in the Baldwin area. This restricts possibilities for rapid growth in the future, or development as a concentrated populated area. Geographical and other barriers stand in the way of intensive development. To these may be added the fact that the Baldwin, while located in what may be, by certain standards, suburban territory, is, in reality, part of urban Los Angeles. Tests show that patronage in suburban theatres is stable, drawn from a more or less concentrated area within a radius of four miles. However, the proximity of the Baldwin to theatres in the Crenshaw and Wilshire Districts may cause it to draw patronage from the areas which they serve. This fact and its price policy are also determinants. In sum, all these and other factors already alluded to (*and still others to be adverted to further on in the discussion*), considered in the light of the basic idea which calls for differentiation in classification between the Baldwin and other theatres, warrant its exclusion from first run.

## VI

### Subsequent Availability

The main considerations which call for classification of theatres outside the first-run group obtain also as to the classification in the 21-day availability group. The testimony as to these matters overlapped. It would be difficult and wholly unprofitable to segregate it. More, it is not the object of this opinion to outline *in detail* the testimony in the case, all of which has been assayed. Only the result will be given.

It should not be forgotten that the Government, in the Paramount case, sought to condemn *all* clearances. But the Courts refused to sustain this view. They condemned only unreasonable clearances.[32]

32. United States v. Paramount Pictures, Inc., D.C.N.Y.1946, 66 F.Supp. 323, 341.

This is now the accepted law.[33] This view of the law has been criticized by certain writers who see in the clearance system a method of price-fixing which should have been outlawed in its entirety.[34] Taking, as we must, the view of the law expressed by the Courts, our problem is to determine the reasonableness of the 21-day availability established for the plaintiff's theatre, the Baldwin.

As a general rule, the same availability is established by all producers. But here, again I am convinced that this was not the result of concert, but flowed from the very nature of the clearance system. Indeed, instances exist of different availabilities in the same theatre for the productions of different companies. Whenever this occurred, it brought objections from theatre-owners who complained that, by this method, they were prevented from relying upon a "constant flow" of pictures. It is to the interest of the producers and exhibitors that the exploitable life of a picture be not too short. The "staggered" system lengthens the period. The basic idea behind clearances is that the farther the location of a theatre is from a focal point,—such as urban Los Angeles,—the shorter the clearance should be. The Baldwin is considered a part of urban Los Angeles. It would normally draw from the Crenshaw and Wilshire areas. Any change in its availability would require corresponding changes in all three areas. These, in turn, would call for changes in the theatres adjoining these areas. The result would be a shortening of the exploitable life of the picture, with consequent harm to both producer and exhibitor.

Common ownership of similarly situated theatres may result in identical availability as a matter of choice by the operator. But I find no instance of "allocations of territory". To the contrary, availability is in flux. There is no rigid uniformity. There are constant changes and "move-ups". Loew's Inc., "the major" of "ma-jors", as it were, because of its belief in the superior quality of its productions, determines availability regardless of the policy or wishes of others. Their representatives asserted very emphatically that, while they negotiate with exhibitors, their ultimate action is not determined with reference to the wishes of any exhibitor or class of exhibitors, or of other producers. There is similar testimony as to the other defendants. Many changes in availability have been made from year to year. All producers and distributors consider the plaintiff's theatre, the Baldwin, as being in the same competitive area with the Leimert, Bard's Adams and Crenshaw. For this reason, any change as to availability made as to any of them, would call for adjustment as to the others. By the same token, the theatres in independent areas,—whether they be separate municipalities, such as Glendale, Pasadena, or Inglewood, or integrated communities of the type referred to in the preceding portion of this opinion,—are not deemed to be so competitive with the Los Angeles metropolitan theatres as are the theatres in the urban center.

The granting to such theatres of an availability which is denied to urban neighborhood theatres is, therefore, warranted by these and other special considerations referred to in the preceding discussion.

When the system of double billing is also taken into account, one can readily see how difficult it would be for the theatre-owners to fill programs unless the pictures which come from different producers are available at about the same time and on the same availability. These factors relate directly to the problem of first-run. The significance of advertising of first-runs has already been adverted to. At times, the advertising cost exceeds the rental received from the first-run theatres in the area. In one instance referred to at the trial, $45,000 was spent by one of the defendants to advertise a new picture.

33. See Part III of this Opinion.

34. Eugene V. Rostow, The New Sherman Act: A Positive Instrument of Progress, 1947, 14 U. of Chicago Law Review, p. 567, 596; John R. McDonough, Jr. and Robert L. Winslow, The Motion Picture Industry: United States v. Oligopoly, 1949, 1 Stanford Law Review, p. 385, 413.

The rental received from the two first-run theatres in the area which served this defendant as "showcases" was $38,000. The loss was defended upon the ground that the expense helped establish the picture for the subsequent-run theatres.[35]

Ultimately, not only the producers, but also the exhibitors benefit by the exploitations of first-runs and the adherence to a constant clearance. Whenever a change of availability is asked, the producer has two considerations to take into account: (1) Whether the change would result in additional revenue, and (2) whether the change would affect other theatres in the area. While methods differ to some extent, on the whole the pattern is the same. Studies of the area are undertaken and a recommendation is made by the regional sales manager who approves the change or rejects it. Final approval must be given by the New York Office in those instances where the regional officers do not have the final authority to act. It was the positive testimony of the sales representatives of all the defendants that other producers or exhibitors *were not* consulted. They also defended the limitation of first-runs to a small number of "showcases", as the only means of making a picture valuable for subsequent exhibitors.

Few people come from peripheral areas to the metropolitan areas. But if all the theatres were opened, or the number of "first-runs" were increased, all the patronage from these peripheral areas would combine and some 50 per cent of the patronage would be lost. And, generally, shortening of playing time might harm the *individual* exhibitor in subsequent-run theatres. The multiple theatre operator might benefit. But this is inherent in such ownership, and we cannot prevent it. And any increase in the number of theatres playing the same pictures,—as one witness put it,—"spreads the patronage thinner" as to the individual exhibitor.

Indeed, Harry C. Arthur, Jr., president of the plaintiff corporation, testifying in this court before another Judge,—in an action relating to the franchise whereby they are given exclusive first-runs in their two theatres for Paramount productions,—defended the clearance system and the reasonableness of the 21-day protection for their own theatres. The following colloquies are taken from the record in that case.[36]

"Q. By Mr. Hardy: Mr. Arthur, in your experience as a seller of motion pictures, have you sold them on clearances? A. Yes.

"Q. Invariably? A. Yes.

"Q. In your experience as a motion picture exhibitor and purchaser of pictures, have you purchased them on clearances? A. Yes.

"Q. Invariably? A. Yes.

"Q. Now, *based on that experience what would you say as to whether or not 21-days clearance for first-run pictures at the Paramount Theatre has been reasonable?*

\*       \*       \*       \*       \*       \*

"A. *I don't think that the 21-day clearance of the Partmar Corporation governing the Downtown Paramount Theatre is reasonable to the theatre.*

"The Court: You mean to Partmar?

"The Witness: *I think it is unreasonably short.*

"The Court: To Partmar?

"The Witness: Yes, sir.

"The Court: *You think it should be longer?*

"The Witness: Yes, sir.

\*       \*       \*       \*       \*       \*

"The Court: *Based upon your experi-in the motion picture industry, is it your*

---

35. Such loss is rare and is referred to merely to emphasize the importance of first-runs. One writer has stated that first-runs "produce well over one-half and in some areas four-fifths of the total gross income."
  And the same writer notes that "Between a first-run showing and a late one during the same year, the difference in license fees may be 99.9 per cent." (M. A. Adelman, Effective Competition and the Antitrust Laws, 1948, 61 Harvard Law Review, pp. 1289, 1319).

36. Paramount Pictures Theatres Corp. v. Partmar Corp., D.C., 97 F.Supp. 552.

*opinion that clearances are necessary between the runs?*

"The Witness: *Yes, sir.*

\* \* \* \* \* \*

"Q. By Mr. Hardy: I asked you to state your opinion as to whether 21-days clearance would be reasonable or unreasonable to the second-run theatres on Paramount pictures.

\* \* \* \* \* \*

"A. From our standpoint, I think that they have an advantage on the 21 days. If I testify that the Paramount Theatre should have a longer clearance, I certainly can't agree that there should be 21 days. *In other words, they should be further behind the Paramount Theatre.*

\* \* \* \* \* \*

"Q. *Do you mean that it is not unreasonable as to them?* A. *No.*

\* \* \* \* \* \*

"Q. What would you say as to whether or not the 7-day clearance is reasonable? A. The 7-day clearance—

"Mr. Chance: (Interrupting) Over what?

"Mr. Hardy: I am talking always about a clearance over the first-run use of a picture in the Paramount Theatre during the period from 1939 to 1947.

"The Witness: *The seven-day clearance is too short for the Paramount Theatre. It should be longer.*

"Q. By Mr. Hardy: What would you say as to the 14-day clearance? A. *That should be longer, too.*

"Mr. Chance: Does that mean it is unreasonable?

"The Witness: That means that it is unreasonably unfair to the Paramount Theatre.

"The Court: *You mean it is unreasonably short?*

"The Witness: *That is what I mean, exactly, sir.*" (Emphasis added.)

In his deposition in the case at bar, somewhat similar admissions were made by Mr.

Arthur as to the plaintiff's determination *to retain* the 21-day protection for their theatres, which need not, however, be given in detail. All these admissions *mean* that any change of clearance, *even as to the Baldwin,* would harm the plaintiff's first-run theatres, or, as the witness put it, they might suffer damage downtown for any benefit to the Baldwin. In explanation of the seeming anomaly in seeking a better position for the Baldwin, although convinced that it might harm their first-run theatres, the witness claimed that the demand for the Baldwin is warranted by the fact that theatres which they considered similarly situated,—especially a theatre in Inglewood,—had been given a better clearance. This might be the perfect answer, if there were no reasonable grounds for giving the Inglewood theatre a different classification. If,—as already appears from the discussion,—Inglewood, because it is an independent municipality and an integrated community with a life of its own, impinges theatrically less upon urban Los Angeles than theatres in the urban area, then the force of the justification is lost.

Of itself, an admission may or may not prove a fact.[37] When it does not, it supplies,—for whatever it may be worth,—an inconsistent attitude of the same party. Wigmore thinks that in this lies its chief value, as a "witness' self-contradiction".[38] Hence, the concession as to the reasonableness of the clearance system and the 21-day protection,—although limited to two theatres and the product of one of the defendants,—lends support to the contention that, *other things being equal,* the same claim could be made for the products of other companies which use different theatres as "showcases", whose first-runs they *must* protect.

In consequence, the admission, when correlated to the entire problem of clearances and to the facts already discussed, speaks for the reasonableness of the classification.

It should be added that the evidence in

---

37. Jones on Evidence, 3rd Ed., 1924, Secs. 235–236.

38. IV Wigmore on Evidence, 3rd Ed., 1940, Sec. 1098.

the record indicates that, while the Baldwin, so far as physical appointments, equipment, and projection facilities, compares favorably with other theatres in the same class, and even with some of the suburban theatres to which a better clearance has been given, it was notoriously a "bad" producer of revenue in the 21-day group.

In sum, the limitation of the plaintiff to a 21-day availability finds support in special factors which affect the distribution of motion pictures. As these factors called for the same result, they produced an identity which did not spring from design, but from similarity of situations. All combined to furnish a reasonable basis for the classification which satisfies established legal norms. Having reached this conclusion as to the 21-day availability, we need not explain in detail why the denial of 7 or 14-day availability for the Baldwin can also be justified. The same factors which warrant the establishment and retention of the 21-day limitation exclude an improved condition *at the present time*.

Allusion has already been made to the fact that the Los Angeles area is peculiarly sensitive as to clearances and availability. Even a rumor of possible change of availability brings immediate demands on the part of many exhibitors. When it was rumored in 1949 that Loew's might "ease up" on its first-run policy, an immediate application for such run was made by the Leimert,—one of the Baldwin competitive theatres. Similar requests were made constantly of other producers. Some requests were granted. And the number of theatres changing availability is constantly increasing. The following comparative tables show the differences between the situations in 1945 and 1950.

(A)

*Paramount*

(Summary of changes in availability shown on Exhibit AW)

| *FWC* clear runs | | *Independent clear runs* | *Competitive situations* |
|---|---|---|---|
| | | *7 day Availabilities* | |
| 1945 | 16 | 0 | 0 |
| 1950 | 2 | 0 | 7 situations involving 9 FWC theatres bidding against 18 independents. |
| | | *14 day Availabilities* | |
| 1945 | 3 | 0 | 0 |
| 1950 | 4 | 3 | 3 situations involving 5 FWC theatres bidding against 10 independents. 1 situation of 3 independents. |
| | | *21 day Availabilities* | |
| 1945 | 18 | 7 | 0 |
| 1950 | 7 | 18 | 9 situations involving 10 FWC theatres bidding against 16 independents. 1 situation involving 4 independents. |

*Fox West Coast

(B)

## RKO

(Summary of changes in availability shown on Exhibit BR.)

| FWC clear runs | | Independent clear runs | Competitive situations |
|---|---|---|---|
| | | *7 day Availabilities* | |
| 1945 | 15 | 1 | 0 |
| 1950 | 2 | 0 | 6 situations involving 10 FWC theatres bidding against 19 independents. |
| | | *14 day Availabilities* | |
| 1945 | 2 | 1 | 0 |
| 1950 | 2 | 9 | 4 situations involving 6 FWC theatres bidding against 10 independents.<br>1 situation involving 5 independents. |
| | | *21 day Availabilities* | |
| 1945 | 14 | 5 | 0 |
| 1950 | 9 | 23 | 5 situations involving 7 FWC theatres bidding against 7 independents.<br>2 situations involving 6 independents. |

(C)

## Universal

(Summary of changes in availability shown on Exhibit BU.)

| FWC clear runs | | Independent clear runs | Competitive situations |
|---|---|---|---|
| | | *7 day Availabilities* | |
| 1945 | 18 | 2 | 0 |
| 1950 | 3 | 1 | 6 situations involving 9 FWC theatres bidding against 14 independents. |
| | | *14 day Availabilities* | |
| 1945 | 0 | 1 | 0 |
| 1950 | 1 | 7 | 1 situation involving 2 FWC theatres bidding against 2 independents.<br>1 situation of 4 independents. |
| | | *21 day Availabilities* | |
| 1945 | 18 | 6 | 0 |
| 1950 | 12 | 26 | 5 situations involving 5 FWC theatres bidding against 6 independents. |

## (D)

### *Loew's*

(Summary of changes in availability shown on Exhibit BI.)

| *FWC clear runs* | | *Independent clear runs* | *Competitive situations* |
|---|---|---|---|
| | | *7 day Availabilities* | |
| *1945* | 14 | 0 | 0 |
| *1950* | 2 | 1 | 6 situations involving 10 FWC theatres bidding against 17 independents. |
| | | *14 day Availabilities* | |
| *1945* | 2 | 1 | 0 |
| *1950* | 3. | 3 | 1 situation involving 2 FWC theatres bidding against 1 independent. 2 situations involving 6 independents. |
| | | *21 day Availabilities* | |
| *1945* | 20 | 7 | 0 |
| *1950* | 7 | 17 | 7 situations involving 10 FWC theatres bidding against 10 independents. 2 situations involving 5 independents. |

## (E)

### *United Artists*

(Summary of changes in availability shown by reference on Transcript pages 2317 and 2323)

| *FWC clear runs* | | *Independent clear runs* | *Competitive situations* |
|---|---|---|---|
| | | *7 day Availabilities* | |
| *1945* | 16 | 1 | 0 |
| *1950* | 3 | 1 | 4 situations involving 8 FWC theatres bidding against 12 independents. |
| | | *14 day Availabilities* | |
| *1945* | 3 | 0 | 0 |
| *1950* | 4 | 3 | 1 situation involving 1 FWC theatre bidding against 2 independents. 1 situation of 5 independents. |
| | | *21 day Availabilities* | |
| *1945* | 14 | 6 | 0 |
| *1950* | 13 | 32 | 0 |

Statistical data introduced by the plaintiff in rebuttal show similar changes even on a narrower range of time. As of August 10, 1949, there were, in the Los Angeles area, 21 Fox West Coast operators on a first-run basis. As of December 31, 1950, the number had been reduced to 16. The situation as to other chain owners remained unchanged. As of August 10, 1949, there were 21 Fox West Coast theatres on a 7-day availability. As of December 31, 1950, the number was reduced to 16. They remained constant as to Warner Bros. They increased from 0 to 5 as to United Artists Theatre Circuit, Inc., and from 9 to 12 as to others. As of August 10, 1949, there were 15 Fox West Coast Theatres on a 14-day availability. The number was reduced to 12 on December 11, 1950. It remained constant as to Warner Bros., increased from 0 to 2 as to United Artists Theatre Circuit, Inc. and from 15 to 16 as to others.

These figures are typical. The contrast between the 1945 and 1950 figures warrants the conclusion made by one of the witnesses that whereas the Fox group had a majority of the first runs in 1945, they had the least in 1950. And, even within the narrower range chosen by the plaintiff, there is a decrease in the favorable situations so far as Fox West Coast group is concerned.

All these point to the fact that any change affects others, similarly situated, be they multiple owners or individual operators. Even a single change begins a chain reaction which runs its course, and, in time, affects more than the theatres involved in the particular change at the particular moment. Consequently, we are not confronted with a situation that is static, or is brought about by design or concert on the part of the defendants to keep it so by illegal means. We are met with a situation which is in flux and which must be considered, not in the light of what the particular defendants may have done before the courts interdicted certain

of their practices, but in the light of what they have done *since* and are doing *today*.

Here, again, even if we find no substantial change, we cannot attribute the absence of change to design unless we also find that conditions which have arisen since the court's interdictions *called for a change*. One of the difficulties with the plaintiff's position in this case is the fact that it assumes that the court decree called *automatically* for changes. From this it postulates that if there be no change, that, of itself, is proof that illegal practices have continued to date. We cannot agree.

This is not a "price-fixing case", or a "block-booking case", where the very existence of the practice calls for condemnation. The practice with which we are concerned in this case relates entirely to *clearances*. And the system of clearances has *not* been condemned by the courts. To the contrary, they have sustained it when reasonable. So, before we can find a particular clearance to be actionable, at the suit of the plaintiff, we must be satisfied that (1) it is unreasonable as to them, and (2) that its impact on them has harmed them. The most important of these elements is the first one. For, if the practice as applied to the plaintiff is not unreasonable, it matters not how much they may have been harmed. For such harm is not actionable under the anti-trust statutes.

Our function is to protect the competitive freedom of interstate commerce in buying and selling motion pictures.[39] This is one of the aims of the anti-trust laws. We must keep the stream of commerce clear of monopolistic practices which the anti-trust laws condemn. And the treble damage action is one of the means of achieving this end.[40]

In the case before us, we are concerned with certain specific clearances and availabilities as they affect the plaintiff. If, as the discussion which precedes

39. White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 1942, 129 F.2d 600, 604; and see, Montrose Lumber Co. v. United States, 10 Cir., 1941, 124 F.2d 573, 578.
40. See Part II of this Opinion.

indicates, we find that these clearances are warranted by special conditions which reasonable persons may take into consideration in determining their action, it is our duty to say so. No parallelism, conscious or unconscious, can overcome a finding of reasonableness.[41] And it is not our function in this type of action to secure a better bargain for a dissatisfied exhibitor. Our sole aim is to vindicate the anti-trust laws in so far as their violation may have brought injury to the plaintiff. What has gone before indicates clearly the factual and legal foundations for the conclusion that there has been no violation of the anti-trust laws by the defendants which has resulted in actionable injury to the plaintiff.

Judgment will, therefore, be for the defendants. More specific findings will be contained in the decision to be filed simultaneously.

---

41. The similarity sought to be established between the situation which obtains in this case and the one which confronted the Court in Milgram v. Loew's, Inc., D.C.Pa.1950, 94 F.Supp. 416, is unavailing. There, the Court was dealing with the exclusion of a new type of theatre, the suburban drive-in, from "first-runs". It condemned it because it found that the denial of "first-run" had "nothing to do with the location, size, equipment, appointments or policy of operation of his theatre or of any particular drive-in theatre as compared with others of the same type, nor with any local competitive situation." Milgram v. Loew's, Inc., supra, 94 F.Supp. at pages 420–421.

Here, the "competitive relation" of the plaintiff's theatre to other theatres similarly situated and to other urban Los Angeles area theatres is a determinative factor which calls for differentiation. So, "conscious parallelism" (See, Note, Conscious Parallelism, Fact or Fancy, 3 Stanford Law Review, 1951, p. 678), even if shown to exist, would not determine the matter, because of the many factors already discussed which give the source and justification for the action of the defendants. See Dipson Theatres, Inc., v. Buffalo Theatres, Inc., 2 Cir., 1951, 190 F.2d 951. "This action * * * does not prove or tend to prove that it was done by agreement * * * any more than proof that a hound is chasing

Cir., 1950, 182 F.2d 228, 233. And see Pevely Dairy Co. v. United States, 8 Cir., 1949, 178 F.2d 363, 368–369.